**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ricky JOHNSON a/k/a Richard Lamar Union and Durand M. Banner, Defendants–Appellants.**

**No. 88–1100.**

United States Court of Appeals, Fifth Circuit.

Dec. 27, 1988.

As Amended Feb. 1, 1989.

Rehearing and Rehearing En Banc Denied Feb. 10, 1989.

---

Daniel W. Sykes, Fort Worth, Tex. (court-appointed), for Johnson.

Jack Wayne Taylor, Arlington, Tex. (court-appointed), for Banner.

Randell P. Means, Asst. U.S. Atty., Marvin Collins, Fort Worth, Tex., for plaintiff-appellee.

Before GOLDBERG, HIGGINBOTHAM, and DAVIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Once again, the "war on drugs" raises Fourth Amendment issues concerning the reasonableness of a search. Appellants conditionally pled guilty to possession of cocaine with intent to distribute, invoking Fed.R.Crim.P. 11(a)(2) to appeal only the district court's denial of their motions to suppress evidence. Finding no error in the district court's decision, we affirm.

On August 19, 1987, the Fort Worth police dispatcher received a call from an unidentified female informant. The caller claimed that she had driven two black males, "Darrell" Banner and Ricky Johnson, from California to Fort Worth. She informed the dispatcher that Banner and Johnson were en route to the Trailways bus station, where they intended to retrieve two suitcases containing a large quantity of "drugs" from lockers 17 and 20. The informant described the men, detailing their appearance and dress, as well as describing one of the suitcases. A few minutes later, the informant called back, stating that Banner and Johnson intended to take the drugs to Houston and that the two men could be armed.

The dispatcher relayed all of this information to Officer Goley, a plainclothes operative in the Vice and Narcotics Unit. Goley and his partner, Officer Marshal, arrived at the bus station at 12:45 a.m., where they observed two men matching the informant's description standing in front of some lockers. Goley left his partner and went to the rear of the terminal, where he conveyed the informant's tip to Officer Stout, an off-duty Fort Worth police officer providing uniformed security for the bus company.

Goley rejoined Marshal and all three officers surreptitiously watched Banner and Johnson. The suspects attempted to make several phone calls before departing in a cab. Goley and Marshal spoke briefly to Stout and then attempted to follow the suspects. By the time the officers reached their car, however, the taxi was gone.

They tried to radio a supervisor to begin the process of obtaining a search warrant, but failed to make contact before the suspects returned to the bus terminal.

Soon after the suspects reentered the station, all three officers observed Banner and Johnson take one suitcase out of locker 17 and another out of locker 20. One of the suitcases had green checks, matching the informant's description. The suspects each carried a suitcase to the Trailways counter where they purchased tickets on the next bus to Houston. Banner and Johnson checked their luggage with the clerk and a claim check was placed on each bag. A Trailways employee placed the bags on rollers, sending them to the rear of the terminal, out of public view. At that point, a porter intercepted the suitcases and, pursuant to Officer Stout's instructions, opened each one.[1] The suitcases contained plastic bags filled with cocaine in base form, commonly known as "crack."

By this time, Banner had stepped outside, preparing to get on the bus, while Johnson remained in the terminal. Officer Stout told Goley the results of the search. When Banner saw Goley and Stout conversing, he began running away from the terminal. Goley chased and arrested Banner, while Johnson was arrested separately inside the bus station.

The original two-count indictment charged Banner and Johnson with conspiracy to distribute and with possession with intent to distribute over 50 grams of cocaine base. Both defendants moved to suppress evidence obtained from the warrantless search of their luggage. Upon denial of these motions, the defendants, pursuant to a plea bargain, pled guilty to a superseding information charging one count of possession with intent to distribute between 5 and 50 grams of cocaine base. Banner and Johnson preserved their right to appeal the district court's decision on the motions to suppress under Fed.R.Crim.P. 11(a)(2). The district court sentenced each defendant to nine years of imprisonment followed by four years of supervised release.

It is undisputed that the officers had probable cause to seize the suitcases and probable cause to arrest the appellants.[2] Appellants argue only that once the police controlled the suitcases, no search could take place without a warrant. The distinction between search and seizure, of course, has ample support in Fourth Amendment jurisprudence:

> Different interests are implicated by a seizure than by a search. A seizure affects only the person's possessory interests; a search affects a person's privacy interests. Recognizing the generally less intrusive nature of a seizure, the [Supreme] Court has frequently approved warrantless seizures of property, on the basis of probable cause, for the time necessary to secure a warrant, where a warrantless search was either held to be or likely would have been impermissible.[3]

Appellants argue that this case falls within that class of cases justifying a warrantless seizure, but not a search, of property.

In particular, appellants suggest that our decision is controlled by two Supreme Court opinions, *United States v. Chadwick*[4] and *Arkansas v. Sanders*.[5] In *Chadwick*, federal narcotics agents had probable cause to believe that a footlocker possessed by suspected drug traffickers contained a controlled substance. The agents arrested the suspects and seized the footlocker, which had been placed in the trunk of a waiting car. An hour and a half after the arrests, agents performed a warrantless search of the footlocker at the federal building. Inside, they found a large quantity of marihuana. On appeal, the government did not allege that any exigency justified the warrantless search. It also did not argue for application of the automobile exception to the warrant requirement. Rather, it argued that the rationale of the automobile exception justi-

---

1. The government has not contended that this search, conducted by a private citizen at the direction of an off-duty police officer, falls outside the scope of the Fourth Amendment. *See United States v. Clegg*, 509 F.2d 605, 609 (5th Cir.1975) ("Preknowledge and acquiescence make a search by a private party a search by the government.").

2. We recognize that the existence of probable cause in this case was a close question, as the police relied on information provided by an unknown informant. However, since appellants do not raise the issue here, we take proba-

ble cause to seize the suitcases as a given. The district court found probable cause based on the detailed information provided by the informant and the fact that the officers had independently verified most details of her call.

3. *Segura v. United States*, 468 U.S. 796, 806, 104 S.Ct. 3380, 3386, 82 L.Ed.2d 599 (1984) (citations omitted).

4. 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

5. 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).

fied a new luggage exception, since luggage, like automobiles, can be highly mobile. It also contended that the search could be justified as incident to a lawful arrest. The Court rejected both arguments, holding that "when no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority." [6] Thus, the Court found the warrantless search violated the Fourth Amendment since it took place after the government had exclusive control of the footlocker.

In *Sanders*, Arkansas police officers faced a situation similar to the narcotics agents in *Chadwick*. Suspected drug traffickers placed a suitcase, believed to contain a controlled substance, in the trunk of a taxi. The suspects entered the vehicle, which began driving away. The officers stopped the taxi and, without permission, searched the suitcase on the spot, finding marihuana inside. Once again, the government alleged no exigent circumstance justifying failure to seek a warrant.[7] Instead, the government asserted that the search fell within the automobile exception to the warrant requirement since the suitcase came from a vehicle stopped by the police. The Court rejected this argument, relying on *Chadwick* to hold that where the police "lawfully have detained one suspected of criminal activity and secured his suitcase, they should delay the search thereof until after judicial approval has been obtained." [8]

Appellants assert that, as in *Chadwick* and *Sanders*, the Fort Worth police had exclusive control of the suitcases checked with the cooperative bus company. Thus, the decision to search the suitcases at the station without first obtaining a warrant violated the defendants' Fourth Amendment rights. Therefore, appellants argue, the district court should have suppressed the evidence obtained from the search, in this case the only evidence sustaining defendants' convictions.

The answer to appellants' contention lies in the factual distinctions between this case and the *Chadwick* and *Sanders* decisions, resulting in a different balancing of interests under the Fourth Amendment. In *Chadwick* and *Sanders*, the suspects had already been detained by police at the time the searches were performed. Here, on the other hand, the government had seized defendants' suitcases, but had made no contact with the defendants. Further, these suspects were preparing to leave within minutes on a bus for Houston. As the government correctly contends, we have previously recognized that the risk of losing criminal suspects can create exigent circumstances justifying a search of luggage. *United States v. Kreimes*, 649 F.2d 1185, 1192–93 (5th Cir. Unit B July 1981). *Kreimes* is indeed similar to this case, and provides support for the officers' course of action here. The impending departure of Johnson and Banner created an exigency. Nonetheless, the government may not rest on *Kreimes* alone. In that case, the search of the suitcase might have been necessary to determine the identity of the suspects. Were the police in *Kreimes* not to have opened the suitcase, they might not have known whom to arrest. Of course, the suitcases of Banner and Johnson might have contained information that would have facilitated arrest, and reduced the danger to bystanders at the bus station. Yet in *Kreimes* the police did not know where the suspects were. The officers did not have the option of immediately arresting the suspects rather than searching the containers. The officers might not have been able to make the arrest but for the search. The search thus might have been the only way to resolve the *Kreimes* exigency. In the instant case, although the exigency was similar, the police had alternative means to resolve it: they could seize the suspects, or they could search the suitcases. *Kreimes* may thus be distinguishable from this case.

■ At the time the officers needed to act, they faced only two realistic choices. They could either open the suitcases, confirming or dispelling their suspicions, or they could seize Banner and Johnson pending application for a search warrant.[9] Giv-

6. *Chadwick*, 433 U.S. at 15, 97 S.Ct. at 2486.

7. *Sanders*, 442 U.S. at 763–64 n. 11, 99 S.Ct. at 2593 n. 11.

8. *Id.* 442 U.S. at 766, 99 S.Ct. at 2594.

9. The officers' other options included 1) put the suitcases on the bus and notify the Houston police, 2) hold the suitcases and notify the Houston police, 3) follow the bus until a search

warrant could be obtained, or 4) detain the whole bus until a search warrant could be obtained. The first two options created a high risk of losing track of the defendants should they leave the bus before arriving in Houston. The third possibility would probably take the officers beyond their jurisdiction, might alert the suspects (who reportedly could be armed), and seems an excessive burden to place on a munici-

en the circumstances presented, and in particular the reasonable concerns for safety presented by this arrest, we believe the officers made a reasonable decision in line with the policies underlying the Fourth Amendment.

Appellants also analogize this case to our decision in *United States v. Lonabaugh,*[10] which involved one suspect not yet in police custody. In *Lonabaugh,* Customs agents went to the Brownsville airport after receiving a tip that Lonabaugh would be sending two suitcases full of marihuana with a female accomplice on a flight to Houston. Lonabaugh and his accomplice arrived at the airport, purchased one ticket to Houston and checked two suitcases with the airline. The woman kept the ticket and the baggage claim checks. Eventually, the couple separated at the departure gate, with the woman boarding the aircraft and Lonabaugh heading for the exit. Agents stopped Lonabaugh in the airport lobby. When Lonabaugh identified the suitcases as his, the agents searched them on the spot though they had neither a warrant nor the suspect's consent. This court reversed the district court's refusal to suppress the marihuana obtained in the search.

*Lonabaugh* does not control here because in that case there were no exigent circumstances justifying the police in taking immediate action. Lonabaugh and the suitcases were in police control. The female accomplice was on a plane preparing to depart, and could have easily been arrested when the plane arrived in Houston. In the meantime, the agents could have obtained a warrant and performed a proper search of the luggage. There was little risk that the woman would exit the airplane during the flight. The case for exigent circumstances in *Lonabaugh* was apparently so slim that the government did not even include the theory in its appellate brief. In this case, by contrast, Banner and Johnson were travelling to Houston by bus, creating

a much higher risk that police would lose the suspects prior to arrest. Thus, exigent circumstances—the potential loss of two suspected drug traffickers—did exist in this case, justifying the police in taking immediate action.

Our approval of the warrantless search performed here rests on the fact that either course open to the officers, arresting Banner and Johnson or searching their suitcases, would invade some Fourth Amendment interest of the appellants. The *Chadwick* line of cases clearly establishes that searching the suitcases intruded on the suspects' interest in the privacy of their luggage. On the other hand, seizing appellants and holding them until a warrant could be obtained would invade their Fourth Amendment interest in personal privacy and security.[11]

We do not undertake the metaphysical task of determining the relative intrusiveness of the two alternatives.[12] Nevertheless, we find it impossible to say that searching these suitcases was clearly more intrusive than arresting Banner and Johnson, especially when viewed at the time the officers acted. By opening the suitcases, the officers could quickly determine the accuracy of the informant's tip. If the report proved ill-founded, the suitcases could be just as quickly closed and loaded on the bus. The entire search would take only seconds. Further, the search would be performed in the back of the bus terminal, with only Officer Stout and the Trailways employee present, away from the inquiring eyes of the fifty to sixty-five people in the station.

By contrast, detaining the suspects until a search warrant could be obtained might have been highly intrusive. The informant indicated that Banner and Johnson could be armed. Further, many innocent citizens were waiting in the bus station. Thus, the officers probably would have needed to use both surprise and superior force in effect-

pal police department. The fourth option would obviously be much more intrusive than detaining the defendants. A fifth possibility, approaching Banner and Johnson and asking their consent to the search, will be discussed *infra.*

10. 494 F.2d 1257 (5th Cir.1973). Appellants in addition point our attention to two other Fifth Circuit cases. *See United States v. Johnson,* 588 F.2d 147 (5th Cir.1979); *United States v. Garay,* 477 F.2d 1306 (5th Cir.1973). However, in these cases, as in *Chadwick* and *Sanders,* the suspects were already in police custody when the searches were performed.

11. *See Winston v. Lee,* 470 U.S. 753, 762, 105 S.Ct. 1611, 1617, 84 L.Ed.2d 662 (1985) (citing *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) for the proposition that forcing an individual to accompany police officers to the police station damages the individual's sense of personal privacy and security).

12. One determines the reasonableness of a search under the Fourth Amendment by balancing the importance of the government's interest against the degree of intrusion. *New York v. Class,* 475 U.S. 106, 106 S.Ct. 960, 967–68, 89 L.Ed.2d 81 (1986). Therefore, the less intrusive a search or seizure, the more likely it is to meet Fourth Amendment standards.

ing the arrest. Given the circumstances, any perceived resistance on the part of the suspects might have required less-than-gentle treatment by the officers. Banner and Johnson might well have been physically restrained, and certainly would have been subjected to a highly intrusive pat down search for weapons. All of this activity would have taken place in front of the curious and excited bus station crowd. Beyond this initial humiliation, the detention might have lasted for hours before a search warrant issued. Undoubtedly, the suspects would have missed their bus, requiring them to wait in the Fort Worth terminal for the next bus to Houston.

Given that the defendants' imminent departure justified the police in taking action, the officers had no choice but to invade some protected Fourth Amendment interest of the defendants. Faced with only two realistic alternatives, the officers chose one which could arguably, if the appellants proved to be innocent, have the least intrusive impact. We are unable to say the police violated appellants' Fourth Amendment rights in so choosing.

■ Where officers face no clear answer regarding which of two courses of conduct represents a greater intrusion on citizens' privacy, the Fourth Amendment generally leaves the choice between those alternatives to the discretion of law enforcement officials. For instance, the Supreme Court has refused to distinguish between search and seizure of a vehicle under the automobile exception to the warrant requirement:

> Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the "lesser" intrusion is permissible until the magistrate authorizes the "greater." But which is the "greater" and which the "lesser" is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.[13]

Thus, where two possible courses lay before law enforcement officers, and neither obviously presents a greater intrusion on Fourth Amendment interests, the Constitution allows officers to choose between them, even to the point of conducting a warrantless search of an automobile. We apply the same principle to these officers' choice between competing law enforcement alternatives.

■ Appellants, however, argue that the government in this case had a third alternative, less intrusive than the two already discussed. They contend that the officers should have approached them and requested permission to search their suitcases. In particular, they rely on the following portion of a footnote from the *Sanders* opinion:

> The State argues that under the circumstances of this case inconvenience to all concerned would have been the only result of deferring search of the suitcase until a warrant was obtained. Those in respondent's position who find such inconvenience unacceptable may avoid it simply by consenting to the search.[14]

Appellants essentially assert that the Fourth Amendment obligated these officers to ask their consent before searching the suitcases. Whatever its merit otherwise, we reject the contention under the circumstances presented here.

Initially, we note that the action appellants advocate might still have intruded on their Fourth Amendment interests. A "seizure" under the Fourth Amendment occurs when a reasonable person, given all the circumstances, would conclude he is not free to leave.[15] Assuming three police officers had approached Banner and Johnson, asking to search their suitcases for drugs, reasonable persons in their position might conclude they were not free to depart. Indeed, if the officers had made such a request and Banner and Johnson had refused, the Fort Worth police doubtless would have taken the suspects into custody.

However, even assuming such a course would not intrude upon appellants' Fourth Amendment interests in the slightest degree, we still do not believe the officers were bound to follow it. Immediately before the decision to search the suitcases, these officers possessed only limited infor-

13. *Chambers v. Maroney,* 399 U.S. 42, 51–52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970); *see also United States v. Ross,* 456 U.S. 798, 807 n. 9, 102 S.Ct. 2157, 2163 n. 9, 72 L.Ed.2d 572 (1982).

14. *Sanders,* 442 U.S. at 764 n. 12, 99 S.Ct. at 2593 n. 12.

15. *Michigan v. Chesternut,* —— U.S. ——, 108 S.Ct. 1975, 1979–80, 100 L.Ed.2d 565 (1988).

mation about Banner and Johnson. They had a report that the suspects were carrying a large amount of a controlled substance, apparently enough to require more than one suitcase. Such a large supply could reasonably lead the officers to infer that these were professional drug traffickers tied into an organized drug smuggling chain. Further, the officers had received information from a highly accurate informant that these men could both be armed. Finally, these events took place in a crowded bus station, requiring the officers to consider not only their own safety, but also that of the fifty to sixty-five people in the terminal. Under these circumstances, we do not believe the Fourth Amendment required the officers to approach the suspects until they were prepared to make an arrest.

Whatever the footnote from the *Sanders* opinion means, it certainly cannot be read as requiring officers to always ask for consent before performing a warrantless search.[16] It should be remembered that in *Sanders*, the Arkansas police already had the suspected drug traffickers in custody before searching the suitcase. Thus, asking for consent to the search did not present nearly the potential for danger that it might have in this case. We find it instructive to call to mind retired Chief Justice Burger's admonition regarding judicial reassessments of police conduct under the Fourth Amendment:

A court making this assessment [whether a detention was too long for an investigative *Terry* stop] should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But "[t]he fact

that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable."[17]

Though asking consent to search appellants' suitcases might, in the abstract, be less intrusive than the course chosen here, we do not believe that fact requires reversal of the district court. Given the rapidly developing events, and the information known to the officers at the time they had to act, we believe they conducted themselves reasonably in balancing law enforcement needs and safety concerns against the intrusiveness of their actions. We do not speak to cases that lack such safety concerns.

AFFIRMED.

GOLDBERG, Circuit Judge, dissenting:

The Constitution does not wait on a bus. It is present wherever people and their effects are found—within suitcases, in back rooms and on terminal benches. The majority's opinion, however, would inform us otherwise in obeisance to optimal law enforcement efficiency.

Waving the word "exigency" like a magic wand, the majority attempts to infuse novel meaning into the "exigent circumstances" exception to the Fourth Amendment's warrant requirement. But the Constitution does not permit us to act as magicians. We must inspect the facts to determine the existence of exigent circumstances. I have looked and looked, but found none here. No flow of words can create exigent circumstances in law where none exist in fact.

Let one point remain absolutely clear concerning the majority's decision. The majority offers three rationales, at various points in its opinion, to justify the searches of the luggage: (1) exigent circumstances ("the impending departure of [the appellants] created an exigency"); (2) safety

---

**16.** That no such absolute requirement exists can be seen from the Supreme Court's decision in *New York v. Class,* 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986). In that case, police officers stopped a car for traffic violations and the driver voluntarily exited the vehicle. While the driver informed one of the officers that he had no driver's license, the other officer approached the automobile to determine its vehicle identification number, mounted on the dashboard. The number was obscured by some papers. The officer reached into the interior of the car to move the papers and in the process discovered a gun underneath the driver's seat. The New

York Court of Appeals ruled that the gun should be excluded from evidence because, under state law, the officer could have asked to see the vehicle identification number and the driver would have had to move the papers himself, thus eliminating any intrusion by the officer. The Supreme Court reversed, finding the officer's conduct reasonable under the circumstances.

**17.** *United States v. Sharpe,* 470 U.S. 675, 686–87, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605 (1985) (citations omitted; quoting *Cady v. Dombrowski,* 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973)).

concerns ("We do not speak to cases that lack such safety concerns"); (3) police discretion concerning the relative "intrusiveness" of police choices in a criminal investigation.

As I shall discuss in detail *infra,* the third rationale must stand as the *ratio decidendi* of the majority's decision. The exigency rationale fails, as I note above and discuss in detail below. The safety rationale similarly fails. The officers had probable cause all along to arrest in this case. No *arrest-related* dangers could have been lessened by a search of the suitcases' contents. A search would have led to an equivalent or potentially more dangerous arrest scenario, on the one hand, or a cessation of the investigation, on the other. This line of argument involves no relevant safety concerns. It involves only the efficiency of investigation and a desire to avoid apprehension of potentially innocent criminal suspects. This actually constitutes the third rationale for the majority's decision. It is a coherent rationale, but it is inconsistent with the dictates of the Fourth Amendment.

Although the majority would appear to have it otherwise, the Fourth Amendment imposes more than an obscure "reasonableness" standard on police in cases like this one. It imposes a clear legal rule—the warrant requirement. Because the majority subordinates both the rule of law and a person's legitimate expectation of privacy in the contents of luggage to the efficiencies of police discretion, I dissent.

## I. *Introduction.*

The majority displays a laudable interest in incarcerating drug dealers, a corrosive force in our society. But its decision, which (1) attempts to redefine the meaning of the "exigent circumstances" exception and (2) creates a broad and novel "greater/lesser intrusion" exception to the warrant requirement of the Fourth Amendment, errs fundamentally by subordinating *constitutionally* guaranteed rights to optimal law enforcement efficiency. The Su-

preme Court has instructed us unanimously that " '[T]he mere fact that law enforcement may be made more efficient may *never* by itself justify disregard of the Fourth Amendment.... The investigation of crime would *always* be simplified if warrants were unnecessary. But the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's ... property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law.' "[1]

We all enjoy an especially powerful expectation of privacy in luggage. The warrant requirement gives meaning to the process of having a neutral and detached magistrate justify a search of luggage that is in the exclusive control of police officers. But the majority, placing the cart before the horse, would have us believe that privacy rights dissipate when a warrantless search actually uncovers criminal activity. Although every decision is made easier by hindsight, the government cannot justify unconstitutional police behavior because it happens to have ferreted out criminal activity. As the Court has clearly and recently stated, "[A] warrantless search could not be characterized as reasonable simply because, after the official invasion of privacy occurred, contraband is discovered."[2] This rule has deep roots in the Court's jurisprudence. In *Byars v. United States,*[3] for example, the Court stated that "A search prosecuted in violation of the Constitution is not made lawful by what it brings to light."

In paying such extreme deference to efficiency, described in terms of police discretion, the majority has overlooked two basic and deeply-rooted tenets of Fourth Amendment jurisprudence. First, the warrant requirement is still the rule with respect to police searches, not the exception, and therefore " 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' "[4] Second,

1. *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290 (1978) (emphasis added; citations omitted; Court unanimous in this portion [Part I] of Justice Stewart's opinion); *accord United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 2481–83, 53 L.Ed.2d 538 (1977). Despite the vision of some commentators, then, efficiency has not shrouded rights analysis in the eyes of the Court. *See, e.g.,* Frank Easterbrook, The Supreme Court, 1983 Term—Fore-

ward: The Court and the Economic System, 98 Harv.L.Rev. 4, 59 (1984).
2. *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 1657, 80 L.Ed.2d 85 (1984) (citing fifty-seven years of Court precedent).
3. 273 U.S. 28, 47 S.Ct. 248, 248, 71 L.Ed. 520 (1927).
4. *Thompson v. Louisiana,* 469 U.S. 17, 105 S.Ct. 409, 410, 83 L.Ed.2d 246 (1984) (per curiam), (quoting *Katz v. United States,* 389 U.S. 347, 88

then, because "the few situations in which a search may be conducted in the absence of a warrant have been carefully delineated[,]" ... " 'the burden is on those seeking the exemption to show the need for it.' "[5] The majority transforms the government's *burden* into a presumption in the government's favor. The presumption holds that the efficiencies of discretionary police investigation justify otherwise unconstitutional intrusions into an individual's luggage. This is disturbing alchemy indeed.[6]

I shall confine myself to a discussion of three fundamental bases for my dissent. First—and most important for us as an inferior court—this case is controlled by the Supreme Court's decisions in *United States v. Chadwick*[7] and *Arkansas v. Sanders*,[8] the relevant portion of which follows *Chadwick*. This case which involves no exigent circumstances justifying a warrantless search, is substantively indistinguishable from *Chadwick* and *Sanders*. The majority's opinion is also flatly inconsistent with the indistinguishable controlling law of this circuit.[9] One panel of this circuit, of course, cannot overrule an earlier decision of another panel.[10]

Second, even if *Chadwick* and the law of this circuit were not obviously controlling, the majority's new "greater/lesser intru-

sion" exception to the warrant requirement, the language of which is rooted in the "automobile exception" line of cases, is not supported by precedent and creates unsound policy. The majority's discussion of "greater" and "lesser" intrusions is integrally bound up under the particular facts of this case with the majority's vision of what constitutes an exigency. However, the "greater/lesser intrusion" exception created by the majority has independent jurisprudential significance. For this reason, it merits extensive discussion.

Finally, even assuming we had the power to overrule *Chadwick* and earlier decisions of this circuit, and attempted to extend the rationale for the "automobile exception" to luggage, which the majority hints at doing, our reasoning would necessarily fail as unwarranted and unjustified because the automobile exception is not analogous to this case.

## II. *Discussion.*

The critical facts of this case are adequately recounted in the majority opinion. My differences with the majority lie in its application of the Fourth Amendment to the events that occurred in the Fort Worth Trailways terminal.

---

S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) as one in a "long line of cases"); *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982); *Mincey,* 98 S.Ct. at 2412; *see O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 1499, 94 L.Ed.2d 714 (1987) (plurality opinion); *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 1657, 80 L.Ed.2d 85 (1984). The Court has discussed with care these exceptions and their justifications. *See, e.g., Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (inventory search); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (consent); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plain view) (plurality opinion); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (automobile search); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (search incident to arrest); *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (exigent circumstances).

5. *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235 (1979), (quoting *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951) (additional citations omitted)). The Court in *Jeffers* added that "In so doing the Amendment does not place an unduly oppressive weight on law enforcement officers but merely interposes an orderly procedure un-

der the aegis of judicial impartiality that is necessary to attain the beneficent purposes intended." *Jeffers,* 72 S.Ct. at 95, *citing, Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

6. The law enforcement context occupies a distinctive position in the Court's jurisprudence. The Court's decisions in cases such as *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (school search) do not involve law enforcement investigations in unexceptional circumstances like those present in this case. Indeed, the Court has been careful to distinguish the law enforcement context in recent cases. *See O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 1498, 1500, 1502, 94 L.Ed.2d 714 (1987) (plurality opinion); *T.L.O.,* 105 S.Ct. at 743 n. 7; *id.* at 747 n. 1 (Powell, J. joined by O'Connor, J., concurring); *id.* at 748 (Blackmun, J., concurring in the judgment).

7. 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

8. 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).

9. *United States v. Lonabaugh,* 494 F.2d 1257 (5th Cir.1973).

10. *Johnson v. Moral,* 843 F.2d 846, 847–48 (5th Cir.1988) [en banc decision pending].

### A. Supreme Court Precedent Controls: Chadwick.

The unequivocal holding of *Chadwick* controls this case. Needless to say, we have no power to overrule *Chadwick*. Although the majority attempts to distinguish *Chadwick* on its facts, the attempted distinction actually cuts against the majority's reasoning. Neither *Chadwick* nor this case involves exigent circumstances justifying a warrantless search of luggage. I shall discuss *Chadwick* shortly, after explicating the meaning of the phrase "exigent circumstances."

#### 1. The Meaning of "Exigency."

The majority states that the "impending departure of [the appellants] created an exigency." "Exigency" denotes a notion of immediacy, necessity or urgency. In this case, the appellants' luggage was securely in control of the police officers in a back room, far away from the appellants.[11] The appellants were in physical proximity to the plainclothes officers. The picture that majority paints of the suspects' "impending departure" does not create an immediacy, necessity or urgency relating to or justifying a warrantless search of the *contents of the luggage*.[12] Rather, the majority paints on the canvas of efficiency.

Whether the appellants' departure was "impending" depended upon whether the officers would have allowed them to depart. This would have been a decision within the officers' control and would not have constituted an exigency for this reason alone.[13] In addition, the "impending departure," should the officers have allowed the situation to arise, would not have created an immediacy, necessity or urgency relating to the *contents of the luggage*. There was no possibility that the luggage could have walked away, provided a means for the suspects to grab weapons or other-

wise endanger the officers and the public. And because the officers already had probable cause to arrest the appellants,[14] who were in physical proximity to the plainclothes officers, the suitcases' contents could not possibly have provided the officers with information necessary to apprehend suspects who might otherwise endanger the officers or the public.

The majority cites *United States v. Kreimes*[15] as "similar to this case", stating that *Kreimes* "provides support for the officers' course of action here." I shall not tarry long on the authority of *Kreimes* because even the majority concludes that "*Kreimes* may ... be distinguishable from this case." It most assuredly is. In fact, *Kreimes* serves well to illustrate why exigent circumstances do not exist in this case.

The *Kreimes* court allowed a warrantless search of luggage because its contents could have disclosed the identity and location of an armed fugitive. Recourse to a magistrate would have involved significant delay, and could have resulted in "the [dangerous] possibility of [the] armed fugitive remaining at large."[16] An armed fugitive at large may create an exigency relating to the contents of luggage when those contents may provide information leading to the location, immediate identification and immediate apprehension of the armed, at large fugitive.

In contrast, Officer Stout in this case opened the suitcases merely to see whether they contained drugs. If the suitcases had not contained drugs, then presumably, in the words of the majority, "the suitcases could have been just as quickly closed and loaded on the bus." This is the language of investigative efficiency, not exigency. The majority displays a keen interest in not inconveniencing ultimately innocent suspects by apprehending them—suspects

---

11. See note 18 *infra*.

12. The meaning that the majority attempts to ascribe to the term "exigency" flies in the face of reasoned analysis, as my discussion in the text shall demonstrate. It is also obviously inconsistent with the Supreme Court's explication of the term in *Chadwick* and the Court's other relevant cases. *See, e.g., Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966) (blood sample allowed in absence of warrant because delay to obtain warrant would have resulted in loss of evidence as blood alcohol level diminished); *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 1646, 18

L.Ed.2d 782 (1967) (hot pursuit); *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 2004, 36 L.Ed.2d 900 (1973) (fingernail scrapings justified in absence of warrant to "preserve ... highly evanescent evidence ... under [the suspect's] fingernails").

13. *United States v. Thompson*, 700 F.2d 944, 950 (5th Cir.1983). See note 35 *infra* and accompanying text.

14. See note 26 *infra* and accompanying text.

15. 649 F.2d 1185, 1192–93 (5th Cir. Unit B 1981).

16. *Id.* at 1192.

whom the police have probable cause to arrest. But the majority's concerns cannot properly be expressed in the language of exigency to justify a police invasion of the constitutionally protects contents of luggage.

### 2. *Chadwick Controls.*

The Supreme Court in *Chadwick* has already decided the issue before us. In *Chadwick,* the defendants arrived in Boston on an Amtrak train with a footlocker. Federal narcotics agents, based on information provided to them earlier by railroad officials, kept the defendants under surveillance as they claimed the footlocker. A canine sniff signaled the presence of contraband. After waiting until the defendants lifted the footlocker into the trunk of their car, the officers arrested the defendants.[17] The agents seized the footlocker, which remained in their exclusive control at all times. Although there were no exigent circumstances justifying a warrantless search, the agents opened the footlocker without either a warrant or the consent of defendants. The warrantless search uncovered contraband. The Supreme Court held that the search violated the Fourth Amendment, and the evidence was suppressed.

As in *Chadwick,* the police officers in this case crossed the Fourth Amendment's Rubicon when they invaded the appellants' luggage. The majority recognizes that the police officers in this case had the appellants' luggage in their exclusive control before the searches occurred. "[T]here was not the slightest danger that [the luggage] or its contents could have been removed before a valid search warrant could be obtained."[18] Thus, no exigent circumstances were present that might have justified a warrantless intrusion into the luggage.[19] These were precisely the circumstances present in *Chadwick,* which held that in cases involving personal luggage "the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority."[20] In these circumstances, "[t]he judicial warrant has a significant role to play in that it provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime.' *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed.2d 436 (1948).... [A] warrant assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search."[21]

The Court in *Chadwick* based its decision on the powerful subjective expectation of privacy that individuals have in luggage, an expectation that our society recognizes as reasonable.[22] Luggage is "intended as a

---

**17.** *Chadwick* is unrelated to the "automobile exception" line of cases. *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 2166, 72 L.Ed.2d 572 (1982); *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 2594, 61 L.Ed.2d 235 (1979) (Chief Justice Burger, joined by Justice Stevens, concurring in the judgment); *Chadwick,* 97 S.Ct. at 2483–85.

**18.** *Sanders,* 99 S.Ct. at 2592 (quoting *Chadwick,* 97 S.Ct. at 2484). The record reflects that an Officer McFarland took control of the luggage when Officer Stout joined Officers Goley and Marshal in the terminal after the warrantless searches.

**19.** The warrantless seizures of the suitcases did not violate appellants' Fourth Amendment rights because they were based upon probable cause. *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 3386, 82 L.Ed.2d 599 (1984); *see Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538.

**20.** 97 S.Ct. at 2486.

**21.** *Chadwick,* 97 S.Ct. at 2482 (one citation omitted); *see also, e.g., United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 3415–16, 82 L.Ed.2d 677 (1984); *Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 2088, 80 L.Ed.2d 721 (1984);

*Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983). Compare inventory searches, where "probable cause to search is irrelevant." *Chadwick,* 97 S.Ct. at 2482 n. 5; *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65 (1983); *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *see Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 741, 743, 93 L.Ed.2d 739 (1987) ("police discretion [not prohibited] so long as [it] is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity").

**22.** 97 S.Ct. at 2481–86. *Chadwick* involved a locked footlocker, *id.* at 2479, but the particular type of luggage in the control of police officers is not a distinguishing factor. *See, e.g., Arkansas v. Sanders,* 99 S.Ct. at 2588 (unlocked suitcase).

One's expectation of privacy in luggage may be lessened in certain exceptional circumstances. *See United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977) (international border searches); *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (automobile searches); *Chadwick,* 97 S.Ct. at 2484. The majority does not contend that such

repository of personal effects."[23] These effects may be the most intimate in a person's life. They may communicate boundless information concerning one's political beliefs, sexual practices, financial status, and innermost thoughts—not to mention that these effects may simply be one's dirty laundry.

The Court continues to decide cases and shape its Fourth Amendment jurisprudence using expectation of privacy analysis.[24] *Chadwick*'s holding—that one's expectation of privacy in the contents of luggage in the exclusive control of the police may not be overridden without a warrant—is alive and well.[25] I am therefore disturbed by the majority's failure to follow the straightforward dictates of *Chadwick*.

The majority makes a single, brief attempt to distinguish *Chadwick* and *Sanders*, which followed *Chadwick* on the issue before us, by stating simply that "[i]n *Chadwick* and *Sanders*, the suspects had already been detained by the police at the time the search was performed." Factual distinctions mean little, however, unless they also denote substantive differences between the cases one is comparing. Giving the benefit of the doubt to the majority, the same arrest circumstances would have existed before and after the warrantless search in this case. The failure to detain therefore creates no basis for distinguishing *Chadwick*.

In this case, no one disputes that the police officers had probable cause all along both to arrest the appellants and seize their luggage without a warrant.[26] At all times, the appellants maintained an expectation of privacy in the contents of their luggage. The luggage was in the exclusive control of the police officers, thus requiring the officers to obtain a warrant before searching the contents.

The distinction that the majority attempts to make identifies no substantive difference from *Chadwick* and actually cuts against the majority's argument. If the government could articulate a reason why an arrest after a warrantless search would be preferable to an arrest before a search pursuant to a warrant, a basis for distinguishing *Chadwick* might appear. But neither the government nor even the majority has articulated such a reason in this case.[27] In either arrest scenario, (1) the luggage could not walk away from police control, disintegrate or provide a means for the suspects to grab weapons; and (2) the potential troubles facing the officers and the public were, to give the benefit of the doubt to the majority, identical at best.

The majority speculates about the potential troubles that could have arisen if the officers had approached the suspects be-

exceptional circumstances were present in this case.

**23.** *Chadwick,* 97 S.Ct. at 2484.

**24.** *California v. Greenwood,* —— U.S. ——, 108 S.Ct. 1625, 1628–29, 100 L.Ed.2d 30 (1988) (no reasonable expectation of privacy in garbage deposited on curb outside house and knowingly exposed to the public); *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 1497–98, 94 L.Ed.2d 714 (1987) (plurality opinion) (privacy expectation overridden by operational realities of the workplace).

**25.** *Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987); *United States v. Johns,* 469 U.S. 478, 105 S.Ct. 881, 884, 83 L.Ed.2d 890 (1985); *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 1660 n. 17, 80 L.Ed.2d 85 (1984); *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983) (stating that the portion of *Arkansas v. Sanders* following *Chadwick* was "not affected" by the decision in *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 2166 n. 16, 2172, 72 L.Ed.2d 572 (1982)); *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 2864–65, 69 L.Ed.2d 768 (1981).

**26.** *See United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 823–28, 46 L.Ed.2d 598 (1976); *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 3386, 82 L.Ed.2d 599 (1984). In our review of this case, we must assume that the police officers had probable cause all along both to seize the luggage and arrest the suspects based on the same information. The appellants do not contend on appeal that the officers lacked probable cause to seize either the appellants' persons or their luggage. The record reflects that Officer Goley did not believe probable cause to arrest existed until the warrantless search of the luggage uncovered contraband. Probable cause to seize the luggage and probable cause to arrest are inseparable in this case. Therefore, of course, the government would necessarily have a losing position at the threshold in the absence of probable cause to arrest.

**27.** Although the majority would appear to have it otherwise, the government's burden of justification cannot properly be shifted to the appellants. *See Sanders,* 99 S.Ct. at 2591; *Jeffers,* 72 S.Ct. at 95.

fore the warrantless search. It does so in contrasting such potential troubles to the quiet efficiency of the hidden, warrantless search in the back of the bus terminal. The majority apparently forgets that such potential troubles were no less (and in my view, significantly more) likely to occur in the course of an arrest after the warrantless search. The fact that such troubles did not occur in this case, when the officers arrested the appellants after the warrantless searches, is not a proper aspect of our inquiry. Such hindsight has no place in our analysis of this case.[28]

Persons engaging in criminal activity do not become cooler and less dangerous as their enterprise reaches climactic moments. When law enforcement officers let time pass before arresting two men who may be armed (although the appellants in this case were not in fact armed), and whom the officers have probable cause to believe are engaging in serious criminal activity, they are unnecessarily letting a potentially dangerous situation escalate. Simply because the suspects were not in detention in this case, then, does not alter the force of *Chadwick*. Thus, neither the government, which bears the litigation burden of justification, nor the majority has meaningfully distinguished *Chadwick*. The controlling factor in this case, as in *Chadwick*, is that the police officers controlled the luggage, not that they had failed to detain the suspects.

### 3. *The Role of Consent.*

The majority discusses at length the Court's statement in *Sanders* that "[t]hose in [a defendant's] position who find [the inconvenience of a warrant requirement] unacceptable may avoid it simply by consenting to the search."[29] The majority holds that the statement in *Sanders* "cannot be read as requiring officers to always ask for consent before performing a warrantless search." I find it unnecessary to

respond to this holding because I believe that the majority is making the wrong inquiry altogether. The majority's approach is to allow officers a choice between a warrantless rummaging through luggage, on the one hand, and arrest or consent of the suspects, on the other. The correct analysis gives police officers a choice between making a felony arrest based on probable cause, on the one hand, and asking for consent to a search of luggage, on the other. This latter approach contemplates law enforcement discretion with which I am comfortable.

### 4. *Fifth Circuit Precedent.*

I have one final observation regarding the majority's failure to follow precedent. Because I believe that the Supreme Court has foreclosed meaningful argument on the issue before us, I will not discuss at length the controlling precedent of this Circuit that the majority overrules.[30] I am compelled to clarify, however, that the majority has made a decision beyond the scope of a panel's proper exercise of power. Judge Gee has recently reminded us that "[n]o rule is more firmly settled in our Circuit than [the rule] that 'no panel ... can overrule a decision made by another.' "[31]

The majority attempts to distinguish our prior cases, as it attempts to distinguish *Chadwick*, by stating that "the suspects were already in police custody when the search was performed." *Lonabaugh* suffices to demonstrate that the majority has not distinguished the controlling law of this Circuit. In *Lonabaugh*, we held that a warrantless search of the defendants' luggage that was in the exclusive control of the police was unconstitutional.[32] No exigencies justified the search, and one of the defendants was not in detention but was taken from a waiting plane and arrested after the warrantless search.[33]

The majority attempts but fails to distinguish *Lonabaugh*. In *Lonabaugh*, as in

---

**28.** *See, e.g., Jacobsen,* 104 S.Ct. at 1657; *Byars,* 47 S.Ct. at 248.

**29.** 99 S.Ct. at 2593 n. 12.

**30.** *United States v. Johnson,* 588 F.2d 147 (5th Cir.1979); *United States v. Lonabaugh,* 494 F.2d 1257 (5th Cir.1973); *United States v. Garay,* 477 F.2d 1306 (5th Cir.1973).

**31.** *Johnson v. Moral,* 843 F.2d 846, 847 (5th Cir.1988) [en banc decision pending] (quoting *Ryals v. Estelle,* 661 F.2d 904, 906 (5th Cir. 1981)).

**32.** 494 F.2d at 1260.

**33.** *Id.* at 1259.

this case, no exigency justified the warrantless search of the luggage. The majority states that "exigent circumstances—the potential loss of two suspected drug traffickers—did exist in this case, justifying the police in taking immediate action [because the appellants were traveling to Houston by bus]." However, as I have discussed above,[34] these are not *exigent* circumstances in terms recognized by the Fourth Amendment. The risk of losing the suspects, if they boarded a departing bus, would result from the officers' choice not to either arrest the suspects or ask for consent to a search of their luggage. As I have noted, the government cannot justify a warrantless search by pointing to a "potential" exigency for which the law enforcement officers would have been responsible.[35]

Neither *Chadwick* nor the controlling law of this Circuit is distinguishable from this case. The majority's decision is patently erroneous on these grounds alone.

B. *The Majority's Novel, Boundless and Unwarranted Exception.*

*Chadwick* controls this case. Any further discussion of the majority's opinion, therefore, may seem almost superfluous. But the severe departure that the majority takes from the warrant requirement, aside from its refusal to follow *Chadwick*, demands a response examining the ramifications of the majority's opinion.

The majority upholds the warrantless search of appellants' luggage because the officers "arguably" could have determined on-the-spot that the search was "less intrusive" than a seizure of the appellants. In constitutional terms, which define the scope of our inquiry, this reasoning is fallacious. The only constitutionally protected right implicated in our review is the appellants' right against a warrantless search of their luggage.[36]

The "greater/lesser intrusion" language in the majority's opinion is derived from *Chambers v. Maroney*,[37] an inapposite case concerning the automobile exception to the warrant requirement. I shall discuss the majority's use of *Chambers* in Part II(c) *infra*.[38] In any event, the majority's new warrant exception, unlike the automobile exception, is not tailored to the legitimate needs of law enforcement. Much to the contrary, the majority unnecessarily defers to unbridled law enforcement discretion.

As the majority itself states, its analysis "rests on the fact that [either opening the suitcases or seizing the appellants] would invade some Fourth Amendment interest of the appellants.... Faced with only two realistic alternatives, the officers chose one which could arguably, if the appellants proved to be innocent, have the least intrusive impact."[39] In a demonstration of remarkable deference to police officers, the majority even states that "We do not undertake the *metaphysical* task of determining the relative intrusiveness of the two alternatives" (emphasis added).

---

34. See notes 11 et seq. and accompanying text.

35. *United States v. Thompson*, 700 F.2d 944, 950 (5th Cir.1983) (citations omitted). To the extent that one may read *United States v. Hand*, 516 F.2d 472, 476 n. 10 (5th Cir.1975) (en banc), *cert. denied*, 424 U.S. 953, 96 S.Ct. 1427, 47 L.Ed.2d 359 (1976) as inconsistent with *Lonabaugh*, 494 F.2d at 1259–60, it is clear that *Hand* has been discredited and is no longer controlling precedent. *See United States v. Johnson*, 588 F.2d 147 (5th Cir.1979); *id.* at 156 (Hill, J., specially concurring).

36. *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985); *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

37. 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

38. Much of the language in the majority's opinion also mirrors language in *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). *Sharpe* is inapposite. It involved the reasonableness of an investigative detention, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), not a warrantless search involving (1) luggage in the exclusive control of police officers and (2) probable cause to arrest criminal suspects. In cases like *Sharpe* involving necessarily uncertain legal standards—unlike this case, which involves clear legal rules imposed by the Fourth Amendment—it is proper for a reviewing court to ask whether discretionary law enforcement decisions are reasonable.

39. The statement "if the appellants proved to be innocent" is telling. It assumes away a central issue. We are dealing with the concept of *probable cause*, not with the epistemological question of whether particular criminal suspects are actually engaged in criminal activity.

Even if I agreed with the majority that there are at least two Fourth Amendment interests implicated in our review, which I do not, I unequivocally disagree with its unwillingness to decide which interest it recognizes as superior.[40] Even assuming that we could properly "balance" governmental interests here against individual privacy interests, the majority does not even undertake the duty of weighing the supposed interests on either side of the scale. It moves the balancing process a step back, granting police officers unfettered discretion to determine on-the-spot the relative importance of an individual's two privacy interests, only one of which is constitutionally protected. It then assumes that this discretionary determination concerning the *suspects'* privacy "interests" *constitutes* the governmental interest. Such extreme deference to police officers makes me fear for the soundness of a democracy.[41]

In any event, the mire of balancing—either as a method of adjudication or as a method of criminal investigation—has no place in this case. The majority's all-important premise is an empty one, because it wrongly assumes that there is more than one Fourth Amendment right implicated in our review.

Appellants had a powerful expectation of privacy in the contents of their luggage, a right protected by the Fourth Amendment, that was invaded by the warrantless search.[42] But the appellants did not have a protected Fourth Amendment right against *seizure* of their luggage, which was permissibly reduced to the exclusive dominion of the police, because the officers had probable cause to seize the luggage.[43] Put another way, the appellants lost their possessory interest in the luggage in this case once the police had probable cause to seize it.[44]

Just as the existence of probable cause meant that appellants lost their possessory interest in their luggage in this case, the appellants did not enjoy Fourth Amendment protection against warrantless arrest.[45] The majority erroneously contends otherwise by stating that "seizing Banner and Johnson and holding them until a warrant could be obtained would invade the defendants' Fourth Amendment interest in personal privacy and security." The majority cites a single inapposite case, *Winston v. Lee,*[46] to support its erroneous proposition. This proposition is the fundamental component of the framework that defines the majority's new warrant exception.

**40.** Balancing, as a method of adjudication, has come under severe criticism of late. *See, e.g.,* T. Alexander Aleinikoff, Constitutional Law in the Age of Balancing, 96 Yale L.J. 943 (1987); Comment, Some Traditional Thinking About Non-Traditional Searches: Mandatory Drug Testing, the Fourth Amendment and the Supreme Court's Balancing Methodology, 1988 U.Chi.Legal F. 285. Even assuming that balancing were a proper method of adjudication in this case, it is the judicial duty and domain to weigh values, not the domain of the police. Under the majority's approach, which allows police officers to choose a course of action "arguably" having the "least intrusive impact," "appellate courts defer to trial courts and trial courts defer to the police." Anthony G. Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. 349, 394 (1974).

**41.** In related contexts, the Court has not looked favorably on vesting too much discretion in police officers. *Cf. Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 2260, 60 L.Ed.2d 824 (1979) (White, J., concurring) ("[I]f courts and law enforcement officials are to have workable rules, ... balancing must in large part be done on a categorical basis—not in an ad hoc, case-by-case fashion by individual police officers") (citations omitted); *see also Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 1743, 80

L.Ed.2d 214 (1984) ("The ad hoc approach not only makes it difficult for the policeman to discern the scope of his authority, ... it also creates a danger that constitutional rights will be arbitrarily and inequitably enforced") (citations omitted); *United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 2136, 32 L.Ed.2d 752 (1972) (quoting Lord Mansfield's admonition in 1765 that magistrates, not officers, are the appropriate authorities to make discretionary decisions). In a pluralistic society such as ours, arbitrary and unequal enforcement of the law resulting from excessive police discretion should be of the foremost concern.

**42.** See note 25 and accompanying text.

**43.** *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 3386, 82 L.Ed.2d 599 (1984); *see Ex parte Jackson,* 96 U.S. 727, 728, 24 L.Ed. 877, 879 (1878).

**44.** *Segura,* 104 S.Ct. at 3386.

**45.** *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985); *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Cupp v. Murphy,* 412 U.S. 291, 295, 93 S.Ct. 2000, 2003, 36 L.Ed.2d 900 (1973).

**46.** 470 U.S. 753, 105 S.Ct. 1611, 1617, 84 L.Ed.2d 662 (1985).

Upon inspection, it is clear that *Winston* does not support but instead undermines the majority's position. Once the police had probable cause to arrest the appellants in a public place for a suspected felony, the appellants no longer *had* a protected Fourth Amendment interest in not being seized.[47] In contrast, the Court in *Winston* addressed whether the Commonwealth of Virginia could constitutionally compel a felony suspect "to undergo a surgical procedure under a general anesthetic for removal of a bullet lodged in his chest" for evidentiary purposes.[48] Holding that such a compelled intrusion would violate the Constitution, the Court stated that "Putting to one side the procedural protections of the warrant requirement, the Fourth Amendment generally protects the 'security' of '*persons*, houses, papers and effects' against official intrusions *up to the point* where the community's need for evidence surmounts a specified standard, ordinarily *probable cause.*"[49] The present case is such an ordinary and unexceptional case, involving probable cause and felony suspects in a public place who were not entitled to Fourth Amendment protection from a warrantless arrest.[50]

The majority erroneously relies on language in *Winston* that reviews the factors enunciated in *Schmerber v. California,*[51] regulating compelled bodily intrusions. The inquiries in *Schmerber* and *Winston* asked whether *given* probable cause, the government could justify puncturing skin with a needle in pursuit of blood, or slicing into flesh with a scalpel in search of a bullet. In *Winston*, then, the government was held to a *higher* standard than probable cause before it could justify operating on a suspect for purposes of gathering evidence. Obviously, the majority does not suggest that police officers must be held to a standard higher than probable cause before they may arrest a felony suspect in a public place.[52] Thus, *Winston* not only fails to support the majority's proposition, it fatally undermines the proposition.

Given that the appellants in this case had only one protected Fourth Amendment interest—their privacy right concerning the contents of their luggage—the foundation for the majority's "greater/lesser intrusion" exception disintegrates. The only intrusion in this case *implicating the Constitution* was the warrantless search of appellants' luggage. In constitutional terms, there was no greater or lesser intrusion that an officer could have *compared* to the warrantless invasion of the appellants' luggage, even assuming the propriety of a discretionary decision on the scene.[53] The rationale for the majority's new exception is, therefore, entirely tautological. In searching for *reasons* to (1) overcome the constitutional rule against warrantless searches of luggage in the exclusive control of police officers; and (2) justify deference to the unbridled discretion of police officers engaged in the "often competitive enterprise of ferreting out

47. *Id.* at 1615–16. Officer Goley testified at the suppression hearing that based on the initial information he received from the dispatcher, he believed that he was investigating a felony.

48. *Id.* at 1614.

49. *Id.* at 1615–16 (emphasis added); *accord Cupp v. Murphy,* 412 U.S. 291, 295, 93 S.Ct. 2000, 2003.

50. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 823–28, 46 L.Ed.2d 598 (1976). After a warrantless detention occurs, police officers have sufficient opportunity to have a magistrate pass upon their probable cause determination. *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975); F.R.Crim.P. 5(a); Tex. Rev.Stat.Ann. arts. 14 and 15 (Vernon 1977 and 1989 supp.).

Police officers receive ample protection from civil liability in this context if a magistrate determines that an arrest was based on less than probable cause. Officers are entitled to qualified immunity from civil liability if their actions

and decisions are "objectively legally reasonable" under the circumstances of a particular case. *Anderson v. Creighton,* — U.S. ——, 107 S.Ct. 3034, 3038–40, 97 L.Ed.2d 523 (1987).

51. 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

52. Indeed, the majority could not do so even assuming it were so inclined. *See Watson,* 96 S.Ct. at 823–28.

53. This also means, of course, that there were no Constitutionally protected degrees of intrusion for a *reviewing court* to consider either. As I note above, the majority states that it would not weigh the relative values of such Constitutional rights in any event ("We do not undertake the metaphysical task of determining the relative intrusiveness of the two alternatives"—that is, arresting the suspects or "rummaging through the contents of their luggage." *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983)). *See* note 40 *supra* and accompanying text.

crime"[54], the majority offers a basis already discredited by the Supreme Court that is identical to the majority's conclusion: the optimal efficiencies of discretionary law enforcement. The majority has apparently forgotten what "we must never forget[:] that it is a constitution we are expounding."[55]

Apart from the circular quality of the majority's reasoning, and apart from the precedential vacuum in which the majority creates its new warrant exception, I am greatly disturbed by the implications of the majority's decision for police practices in the future. The majority's new exception communicates to law enforcement officers that discretion in criminal investigations is a consuming value. Put more concretely, the exception will undoubtedly encourage less thoughtful police conduct in the future in cases where a quick rifling through luggage behind closed doors may appear—to an investigating officer—to harm no one.

The jurisprudential implications of the majority's broad new "greater/lesser intrusion" test also worry me greatly. The test (1) replaces the guarantees of constitutional rules with the discretion of police officers; and (2) holds the potential, in cases involving the police, of soaking up Fourth Amendment jurisprudence like a blotter because of its seemingly appealing simplicity.

The majority does not seem to be particularly disturbed by the prospect of "an officer's rummaging through the contents of ... luggage."[56] Its opinion states that "By opening the suitcases, the officers could quickly determine the accuracy of the informant's tip. If the report proved ill-founded, the suitcases could be just as quickly closed and loaded onto the bus. The entire search would take only seconds ... [and] would be performed in the back of the bus terminal." I believe that clandestine police practices are not to be celebrated or tolerated in a democratic society. It is well worth keeping Justice Jackson's

insights in mind in this context: "Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart [as a deprivation of Fourth Amendment rights]. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government."[57]

The majority's embrace of clandestine police practices is further highlighted by its position that invasions of luggage by police officers in back rooms may save those from "humiliation" who are not actually engaged in criminal activity, but whom the police have probable cause to believe are so engaged. This assumption contains two false premises. First, the majority assumes that ultimately innocent people, whom police officers have probable cause to believe are engaging in criminal activity, do not mind having the police inspect the contents of their luggage as an alternative to arrest. It seems to me that the better position is that some people may mind, and some may not, but the Constitution requires us to assume that those who care about their privacy rights must be protected. One's political beliefs, sexual practices, financial status and dirty laundry may be at stake.

Second, the majority assumes that the "humiliation" of a public arrest should be avoided if at all possible. While I will not quibble with the majority over what constitutes humiliation, I believe that the value of public police practices in a democratic society is immeasurable.[58] The probable cause standard already exists to protect the populace from arbitrary arrest, and further speculation regarding the epistemological issue of a suspect's ultimate guilt or innocence has no proper place in our inquiry. When police officers have probable cause to arrest a criminal suspect, any potential "humiliation" is a byproduct of the officers having done their work adequately and justifiably. The alternative, favored by the

---

**54.** *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948) (Jackson, J.).

**55.** *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 336, 4 L.Ed. 579, 602 (1819).

**56.** *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983).

**57.** *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 1313, 93 L.Ed. 1879 (1949) (Jackson,

J., dissenting). Justice Jackson wrote, as the recent Nuremberg chief prosecutor for the United States, with the heart and mind of a man who had stared terror in the face.

**58.** My concern is evidenced by considering the structure of societies infected by secret police practices.

majority, is discretionary and standardless rummaging through the private contents of luggage in back rooms. I fervently hope that the majority's vision is not the harbinger of a brave new jurisprudence.

### C. The Automobile Exception Is Not Analogous.

The source of the majority's "greater/lesser intrusion" locution lies in the text of *Chambers v. Maroney*,[59] an automobile exception case. Although the Court has made it abundantly clear that warrantless searches of automobiles are permissible for pragmatic reasons that are inapplicable to personal luggage, the majority nonetheless relies on *Chambers*. The majority opinion, however, fails to explain why an extension of the automobile exception cases would be justified in this case. This is not surprising, of course. Only the Supreme Court has the power to extend the exception beyond the well-defined physical confines of the automobile to personal luggage in the exclusive control of the police. Once again, I believe that *Chadwick* controls this case.[60] But because the majority has embraced aspects of the automobile exception and chosen to relegate *Chadwick* to a netherworld, I am compelled to respond to the flaws in its reasoning.

*Chambers* is a pivotal case in the line of automobile exception cases. The majority, however, fails to explain *Chambers'* language in light of its predecessors and its progeny.[61] These cases offer rationales for the automobile exception that have no proper application to personal luggage in the exclusive control of law enforcement officers.

First, the Court's decisions reflect that an individual's expectation of privacy regarding anything within the confines of a vehicle is substantially less meaningful than one's expectation of privacy concerning the contents of personal luggage not contained within a vehicle.[62] This position offers a clearly-defined, practical rule for the populace, police officers and reviewing courts.[63] It also should guide the decision in this case. The Court continues to accept *Chadwick*'s dictates as vibrant in the face of the automobile exception.

Second, the well-defined rule that automobiles and their contents may be searched without a warrant offers boundaries, both physical and conceptual, to the scope of warrantless police searches. Application of the automobile exception to luggage in the hidden recesses of bus terminals does not offer clear limiting principles, either physical or conceptual, with respect to discretionary police activity.[64]

**59.** 399 U.S. 42, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970).

**60.** *Chadwick* explicitly distinguishes *Chambers*. The opinion states that "It was the greatly reduced expectation of privacy in the automobile, coupled with the transportation function of the vehicle, which made the Court in *Chambers* unwilling to decide whether an immediate search of an automobile, or its seizure and indefinite immobilization, constituted a greater interference with the rights of the owner. This is clearly not the case with locked luggage." 97 S.Ct. at 2485 n. 8.

**61.** *See, e.g., United States v. Johns,* 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985); *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed.2d 543 (1925).

**62.** *United States v. Johns,* 469 U.S. 478, 105 S.Ct. 881, 885, 83 L.Ed.2d 890 (1985); *Sanders,* 99 S.Ct. at 2591; *Chadwick,* 97 S.Ct. at 2484; *see United States v. Sanchez,* 861 F.2d 89, 90–91 (5th Cir., 1988); *see also United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983); *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976);

*Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 1979, 26 L.Ed.2d 419 (1970).

**63.** *But cf.* Amsterdam, Perspectives on the Fourth Amendment, 58 Minn.L.Rev. at 384.

**64.** Justices Blackmun and Rehnquist dissented in *Chadwick* and *Sanders,* stating that they favored "a clear-cut rule to the effect that a warrant should not be required to seize and search any personal property found in an automobile", *Sanders,* 99 S.Ct. at 2597 (Blackmun, J., dissenting), or "incident to an arrest." *Chadwick,* 97 S.Ct. at 2487, 2489 (Blackmun, J., dissenting) ("[A] suspect's expectations of privacy are properly abated by the fact of the arrest itself"); *see also United States v. Ross,* 102 S.Ct. 2157, 2173 (Blackmun, J., concurring). The majority in this case, which involves neither automobiles nor a search incident to arrest, offers no "clear-cut rule." Instead, it offers only broad discretion to law enforcement officers "engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). *Cf.* K. Davis, *Discretionary Justice* at, *e.g.,* 88 (1969).

Third, there are also powerful administrative reasons justifying warrantless automobile searches that do not apply to searches of personal luggage outside the physical confines of an automobile. As the Court explained in *Arkansas v. Sanders*,[65]

> "the seizure of a suitcase [is] quite different from the seizure of an automobile. In *Chambers*, if the Court had required seizure and holding of a vehicle, it would have imposed a constitutional requirement upon police departments of all sizes around the country to have available the people and equipment necessary to transport impounded automobiles to some central location until warrants could be secured. Moreover, once seized automobiles were taken from the highway the police would be responsible for providing some appropriate location where they could be kept, with due regard to the safety of the vehicles and their contents, until a magistrate ruled on the application for a warrant. Such a constitutional requirement therefore would have imposed severe, even impossible, burdens on many police departments.... No comparable burdens are likely to exist with respect to the seizure of personal luggage."[66]

The substantial administrative burdens that would arise from a warrant requirement regarding automobiles do not exist with respect to luggage. Police officers do not need storage facilities, towing vehicles and administrative machinery to retain luggage already in their control pending a warrant.

In *United States v. Ross*,[67] the Court again considered the automobile exception in the course of distinguishing *Chadwick*.[68] The Court held that police officers may conduct a warrantless search of an automobile, including the interior of containers within the automobile, when they have probable cause to believe that contraband is concealed somewhere inside the vehicle. The Court distinguished *Chadwick*, and the reasoning in *Sanders* following *Chadwick*, by pointing to the "*practical considerations* that justify a warrantless search of an automobile [that] continue to apply until the entire search of the automobile and its contents has been completed."[69] Justice Stevens' opinion states that "until the container itself was opened the police could never be certain that the contraband was not secreted in a yet undiscovered portion of the vehicle; thus in every case in which a container was found, the vehicle would need to be secured while a warrant was obtained. Such a requirement would be directly inconsistent with the rationale supporting the decisions in *Carroll* [*v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)] and *Chambers*."[70]

*Ross*, then, allowed a warrantless search of containers within an automobile in order to remain consistent with the pragmatic and clear rule-oriented bases for the earlier automobile exception cases. A hypothetical scenario illustrates why requiring a warrant for containers found in a vehicle would be inconsistent with the reasons underlying the automobile exception: the police have probable cause to believe that contraband is contained *somewhere* in a vehicle. As they begin their search, they find several containers in the vehicle. After securing the containers, they search the automobile and find no contraband. They proceed to obtain a warrant to search the containers they have secured. The officers, of course, do not know if the containers hold contraband, although they have probable cause to believe that they do. Therefore, they must secure the vehicle pending the issuance of a warrant for the container searches because *if* the containers hold contraband, the vehicle will become important for evidentiary and other purposes in the course of a criminal prosecution.

It is this operative locational uncertainty that requires both investigating officers and a reviewing court to treat searches of automobiles with containers and searches of automobiles without containers identically. The Court in *Ross* recognized this. Its holding was therefore necessary to avoid imposing the administrative burdens proscribed by the Court's reasoning in *Sanders*. *Ross* recognized that the automobile

---

**65.** 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).

**66.** *Id.*, 99 S.Ct. at 2594 n. 14 (citation omitted).

**67.** 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

**68.** *Id.*, 102 S.Ct. at 2165–69.

**69.** 102 S.Ct. at 2171 n. 28 (emphasis added).

**70.** *Id.*

cases are quite exceptional, and are "based on the *practicalities* of the situations presented." [71] Neither *Ross* nor any other case, then, calls into question the holding in *Chadwick*, which should control this case.

### III. *Conclusion.*

Respect for Constitutionally enshrined rights allows our democracy to flourish. The Framers intended the Fourth Amendment to guarantee that the efficiencies generated by unbridled law enforcement discretion do not consume the rights of the people to be secure in their effects. These values embodied in the Fourth Amendment have been elucidated in a long and elegant line of Supreme Court decisions.

"It follows from the definition of a right that it cannot be outweighed by all social goals" [72]—goals such as optimally efficient law enforcement. The majority supervalues the efficiencies of law enforcement discretion as it devalues the rights guaranteed by the Fourth Amendment. Perhaps the writing is on the wall of the dam, and the majority's decision represents the force of a reservoir ready to rush forth. My deepest hopes are to the contrary. Whatever the case, I dissent, for it is not our place to overrule the Supreme Court, and I fear the implications of the majority's decision.

---

**71.** *Ross,* 102 S.Ct. at 2163 n. 9 (emphasis added).

**72.** Ronald Dworkin, *Taking Rights Seriously* 92 (1978).