[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO SUPPRESS
On December 19, 1991, the defendant, David Gauthier, was arrested and charged with possession of narcotics with intent to sell by a non-drug-dependent person under General Statutes 21a-278(b), possession of narcotics under General Statutes 21a-279(a), and possession of drug paraphernalia under General Statutes 21a-267c, when detectives from the Bristol (CT) Police Department found a syringe, $553 in United States currency, and a cigarette pack containing several small packets of cocaine and heroin inside the pockets of a jacket he had been wearing inside Edgie's Cafe in Bristol. The defendant has moved to suppress this evidence on grounds that the warrantless search and seizures which produced it cannot be justified under any recognized exception to the warrant requirements of theFourth Amendment to the United States Constitution and Article I, Section 7 of the Constitution of Connecticut.
An evidentiary hearing on this Motion was held on divers CT Page 7411 dates in the winter and spring of 1992. In the course of that hearing, the Court heard testimony from several prosecution and defense witnesses and conducted a view of the premises where the challenged search and seizures took place. On the basis of the evidence so developed, the Court makes the following findings of fact and conclusions of law.
FINDINGS OF FACT
The Tip
At about 8:30 p.m. on December 19, 1991, while on duty in the Detective Division of the Bristol Police Department, Detective David Carrello answered a phone call from an unknown male caller who reported that one David "Tiny" Gauthier, described as a large man with a goatee beard, was selling cocaine and heroin "heavy" inside the men's room of Edgie's Cafe. In the course of a ten-second conversation, the nervous-sounding caller told Detective Carrello that Gauthier could be found at a table in front of the bar at Edgie's, where he was wearing a green camouflage jacket inside of which he was carrying a Newport cigarette pack containing his drugs. The caller hung up without identifying himself, disclosing his own whereabouts or describing the basis for his tip.
A nine-year veteran of the Bristol Police Department with over four years' experience as a narcotics officer, Detective Carrello was familiar with both Edgie's Cafe and David "Tiny" Gauthier. He knew Edgie's to be a bar on Broad Street in Bristol that had recently been reopened under new ownership after its former owner was arrested on drug charges. Having visited Edgie's in the course of his police work, he was generally familiar with its layout.
Detective Carrello knew David Gauthier to be a large, distinctive-looking man with a goatee beard who went by the nickname of "Tiny." Carrello had personally arrested Gauthier in 1984 in connection with a reported disturbance at a different Bristol bar. He had also been present in 1989 when a police search team executing a search warrant at a third Bristol bar found heroin on Gauthier's person when they searched him as he sat in a car outside the bar.
When the call was over, Detective Carrello conferred immediately with his supervisor, Detective Sergeant Peter CT Page 7412 Barton, to discuss what should be done. Together, they decided to go at once to Edgie's to conduct a surveillance and determine if the tip could be confirmed. To that end they radioed fellow Detectives Kevin Hayes and David Placzynski to meet them in the parking lot of Crowley's, an auto dealership not far from Edgie's. Moments later, dressed in plainclothes, they left police headquarters for Crowley's in their unmarked cruiser.
Arriving at Crowley's no more than fifteen minutes after receiving the anonymous call, Detectives Barton and Carrello met with Detectives Hayes and Placzynski and arranged for them to remain at Crowley's while they went to Edgie's and conducted the surveillance. Hayes and Placzynski were to be available to assist in any enforcement action to which the surveillance might lead. After giving these instructions, Barton and Carrello drove the short distance to Edgie's to take up their surveillance. The Bar
Edgie's is located on the first floor of a two-story building known as 388 Broad Street in Bristol. The building is on the north side of Broad Street, about twenty feet from the two-lane public roadway in that location. Between the building and the roadway is a small public parking area for patrons of the Cafe. Overlooking the east side of this parking area is a large, two-paned front window, about two feet high and four feet wide,[1] with an electric Lite Beer advertising sign installed in its eastern pane. Mounted at eye level from the perspective of a person standing outside the Cafe, this window is centered about four feet to the west of the southeast corner of the building, along the front, south wall of the Cafe.
Around the southeast corner of the building, at the southern end of the east side of the Cafe, is the public entrance to Edgie's. Consisting of a single, glass-paneled door beneath a small awning bearing the name of the Cafe, it is easily accessed both from the small front parking area and from a larger, public parking area on the east side of 388 Broad Street.
Inside the outer door of the Cafe is a small, glassed-in entrance vestibule containing a small entrance landing, three stairs leading upwards and westward to the barroom floor, and another small landing at the top of the stairs. On the western edge of the vestibule is an inner glass door that opens into the barroom. In all, the vestibule is approximately five feet wide CT Page 7413 and six feet long.
To the north of the glassed-in vestibule is a small recreation area containing a cigarette machine and an electronic bowling game. This 8' x 8' area extends northward from the vestibule to the south wall of the lavatory complex in the northeast corner of the Cafe, and westward from the east wall of the Cafe to the main barroom floor.
To the south and west of a person entering the Cafe through the vestibule is the large, two-paned front window which overlooks the front parking area between the building and the street. The eastern pane of that window is directly to the south of the westernmost portion of the vestibule. Persons in the vestibule or in the small recreation area to its north can see outside the Cafe through this part of the front window by looking through the glass walls of the vestibule and past the Lite Beer sign in the window itself.
The western pane of the large front window extends westward into the barroom, past the western edge of the vestibule along the front, south wall of the Cafe. This pane of the window is immediately to the left of a person just entering the barroom through the inner door of the vestibule.
On the west side of the barroom, built out from and running generally parallel to the west wall of the Cafe, is the bar itself. At the far, northern end of the bar is a narrow passageway between the bar and a large, square, 18" x 18" floor-to-ceiling pillar. This passageway connects the main barroom with a rear lounge which contains a pool table and several tables and chairs.
Separating the rear lounge from the main barroom is a floor-to-ceiling partition that runs eastward from the pillar for about eight feet before turning ninety degrees to the north and running straight to the rear, north wall of the Cafe. The east-west portion of this partition has a large pass-through cut into it. The north-south portion of the partition is a solid wall. The latter serves both as the east wall of the rear lounge and as the west wall of a small hallway leading northward from the main barroom to the lavatory doors.
The men's room is located on the east side of this hallway, in the far northeast corner of the Cafe. Its door opens outward CT Page 7414 into the northernmost part of the hallway. The ladies' room is located directly to the south of the men's room. Its door is directly across the hallway from the southeast corner of the partition. The ladies' room extends about eight feet further south into the barroom than the portion of the rear lounge which is enclosed by the partition.
Directly to the south of the lavatory hallway, on a line between the entrance to the hallway and the western pane of the large front window which overlooks the street, is a second large, square 18" x 18", floor-to-ceiling pillar. This pillar, which has a pay telephone on its west side, stands about six feet due north of the western pane of the front window, to the immediate right and north of a person just entering the barroom through the inner door of the vestibule. Because of the location of this pillar, persons in the north-central portion of the barroom cannot look outward toward the street through the large front window of the Cafe. By the same token, persons looking inside the Cafe through that window have no view whatsoever of the hallway to the lavatories or of the area to its south along the west wall of the ladies' room.
The Surveillance
Upon arriving at Edgie's, Detectives Barton and Carrello decided not to enter the Cafe immediately, nor even to park their unmarked cruiser in either of its two parking areas. Instead, to avoid being seen and identified, they drove their cruiser around and in back of a house directly across the street from Edgie's, pulling it into a darkened driveway facing north toward the center of the building. From this vantage point, at a distance of between eighty and one hundred feet, the detectives had a clear view of the front, south wall of the building with its large, two-paned front window, the small parking area to the south of the building, and the larger parking lot on the east side of the building. Watching generally for suspicious activity and specifically for signs of David Gauthier, they initially focussed [focused] their attention on the large front window of the Cafe.
Within minutes of taking up their surveillance, the detectives spotted David Gauthier walking near the bowling machine in the small recreation area on the east side of the Cafe. At the time of this observation, Gauthier was wearing what appeared to be a green camouflage jacket. CT Page 7415
A few minutes later, having made no additional observations of David Gauthier, Detective Carrello decided to go across the street to get a better look inside the Cafe. Carefully proceeding west before crossing in order not to be seen from inside the bar, Carrello repositioned himself outside the large front window and looked inside the Cafe. From this new vantage point, he once again saw David Gauthier, first sitting, then standing near a table just inside the small recreation area near the bowling game. By this time, however, Gauthier was no longer wearing a jacket.
Shortly thereafter, Carrello saw Gauthier speak briefly to an unknown man near his table, then leave the table for less than a minute, accompanying the man around the corner of the lavatory complex to a place where Carrello could not see them. A few minutes later, while still standing outside the front window, Carrello saw Gauthier engage in similar conduct with another unknown man. Aware that the men's room was located in the back of the Cafe, Carrello surmised that Gauthier and his companions had gone there to consummate drug deals. He conceded, however, that because of the location of the pillar with the telephone on it,[2] he could not see if the defendant or either of his companions even entered the men's room hallway, much less walked up that hallway and entered the men's room itself. Indeed, Carrello never saw Gauthier do anything more on either of these occasions than walk briefly away from his table into the north-central portion of the barroom with an unidentified male companion.
Seeking once again to get a better look inside the barroom, Detective Carrello next moved counterclockwise around the southeast corner of the building to the front entrance of Edgie's, where he resumed his surveillance through the outer door of the Cafe. From this position, he had a clearer view of Gauthier's table in the northwest corner of the small recreation area to the north of the vestibule, but an even less clear view of the north-central portion of the barroom. In particular, he had no view of the hallway to the lavatories or of the area west of the ladies' room immediately to the south of the partition with the pass-through cut into it.
Peering through the front door of the Cafe, Carrello once again saw Gauthier, still jacketless and not visibly in possession of any money, drugs, cigarette packs, other small CT Page 7416 packages suitable for carrying drugs or other tools of the drug trade, standing near his table. Within minutes of taking up this surveillance, he again saw Gauthier converse with an unknown male, then go with the male for less than a minute toward the north-central portion of the Cafe. On this occasion as well, Carrello candidly acknowledged that he observed nothing more than a short conversation between Gauthier and the other man, which at some point led them to walk briefly together to a point where he could no longer see them from his surveillance post. None of Gauthier's companions was a known drug abuser, or even a person who exhibited signs of possible drug abuse. None made a furtive gesture or otherwise acted suspiciously. None was seen to possess drugs, drug paraphernalia, money, small containers or any other items known to be associated with drug use or trafficking. And none was seen to enter the men's room at Edgie's, either alone or together with David Gauthier. In sum, these were three people with whom the jacketless Mr. Gauthier had brief, non-suspicious conversations in a public place, all within the space of 15-30 minutes.
The Search
Having made these observations of David Gauthier's actions inside Edgie's, Detective Carrello decided to report them to Detective Barton. Upon returning across the street to his cruiser, he made his report, then drove with Detective Barton back to Crowley's to meet with fellow Detectives Hayes and Placzynski. At that meeting it was decided that all four detectives would return at once to Edgie's to confront Mr. Gauthier and search his coat for contraband. The less recognizable Barton and Placzynski would enter first, followed shortly by Hayes and Carrello. At the time of this decision, the officers had no warrant to search or arrest David Gauthier.
The four detectives then went directly to Edgie's. According to plan, Detectives Barton and Placzynski went in first, immediately securing David Gauthier near the bowling game. Barton grabbed Gauthier's right arm while Placzynski grabbed his left. Gauthier offered no resistance as the officers who seized him patted him down.
About three feet away from Gauthier, next to the small table at which he had previously been sitting and standing, his green camouflage jacket lay draped over a chair. Ten seconds after Gauthier had been secured, Detectives Carrello and Hayes CT Page 7417 entered the Cafe. Detective Carrello went directly to the green jacket, seized it, then searched it fully for weapons and contraband. Reaching into the upper left pocket of the jacket, he found and retrieved a pack of Newport cigarettes, saying "I've got it." Inside the pack, which he immediately opened, he found several small packets of white powder which later field tested positive for cocaine and heroin. In a lower jacket pocket, Carrello found an identification card bearing the name of David Gauthier, a syringe, and $553 of United States currency. The detectives did not search the bathrooms at Edgie's or stop, search or otherwise investigate any of the men with whom David Gauthier had spoken inside the Cafe.
About forty seconds after the first two detectives entered Edgie's, Gauthier was formally placed under arrest. Though the exact time or arrest is not known, the incident was logged in at 9:30 p.m. on December 19, 1991.
CONCLUSIONS OF LAW
 I.
The Fourth Amendment to the United States Constitution and Article I, Section 7 of the Constitution of Connecticut are intended to safeguard the people's right to privacy, personal security and property against unjustified intrusions by agents of the government. State v. Barton, 219, Conn. 529, 540 (1991). One of the principal means by which they safeguard these rights is by requiring government agents and officers who wish to make intrusions upon the privacy, security or property of private citizens to seek advance judicial approval for their actions. To that end, any officer or agent who proposes to make such an intrusion must apply to a judge for the issuance of a warrant specifically authorizing the intrusion based on a sworn affidavit particularly describing the facts claimed to justify it. When the proposed intrusion is a seizure, the judge must make an informed and independent decision whether the facts set forth in the affidavit establish probable cause to believe that the particular person or thing to be seized is lawfully subject to seizure. When the proposed intrusion is a search, the judge must similarly determine whether the affidavit establishes probable cause to believe that persons or things lawfully subject to seizure are currently located in the particular place to be searched. In either case, no warrant may issue and no search or seizure can be conducted unless probable cause is duly CT Page 7418 established. Id.
A search or a seizure conducted without a warrant issued on the basis of sworn affidavits establishing probable cause "is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." State v. Badgett,200 Conn. 412, 423 (1986). "These exceptions have been jealously and carefully drawn . . . and the burden is on the State to establish the exception." Id. at 424.
In order to justify a warrantless intrusion of any kind, the State must prove that at the time of the intrusion the officer or agent in question was aware of specific facts and circumstances particularly justifying his actions under one or more recognized exceptions to the warrant requirements of our state and federal constitutions. Id. The officer's subjective appreciation of the legal significance of the facts he is aware of at the time of his challenged conduct does not control the inquiry as to the legality of that conduct. Rather, what matters is whether the objective facts of which he was demonstrably aware were sufficient to justify his actions under any recognized exception to the warrant requirement. If they were, then his challenged conduct will be upheld even if he was operating under a false impression of his true legal authority at the time.
Against this background, this Court will separately analyze each of the alternative justifications upon which the State has sought to defend the warrantless search and seizures here challenged. It is of no legal significance that the officers who made the intrusions have not sought to justify their own actions on each such legal ground.
 II.
The State first claims that Detective Carrello's warrantless search of the defendant's jacket and its contents can be justified as a protective search for weapons under the doctrine of Terry v. Ohio, 392 U.S. 1 (1968). The Terry Court held that a police officer may conduct a warrantless pat-down search or "frisk" of any criminal suspect whom he reasonably suspects to be armed and presently dangerous, either to the officer himself or to other persons, without violating theFourth and Fourteenth Amendments' proscription against unreasonable searches and seizures. The Connecticut Supreme CT Page 7419 Court has impliedly agreed that a limited, protective search of a suspect for weapons may properly be conducted without a warrant, under the circumstances described in Terry, without violating the warrant requirement of Article I, Section 7 of the Connecticut Constitution. State v. Dukes, 209 Conn. 98, 122-23
(1988).
Under Terry, a warrantless frisk for weapons can never be justified as or transformed into a general search of the suspect for incriminating evidence. The officer who performs a frisk must therefore be prepared to justify his actions by pointing to specific and articulable facts and circumstances which reasonably support his conclusion that the particular suspect is armed and presently dangerous. The suspicion, however reasonable, `that a person under investigation has committed or is about to commit an unarmed criminal offense is simply an insufficient factual basis upon which to conduct a Terry frisk. Importantly, then, an investigating officer does not have the automatic right to frisk every suspect whom he may lawfully stop and investigate. 3 W. LaFave, Search and Seizure (2d Ed. 1987), s. 9.4(a), pp. 505-508.
Consistent with its limited purpose and justification, a typical protective search for weapons must initially be confined to a patting down of the outer surfaces of the suspect's clothing to detect the presence of concealed weapons or other hard objects which the suspect might use as weapons to harm the officer or other persons nearby.[3] It must not be extended beneath or inside the suspect's clothing unless a properly limited initial pat down reveals the presence of a potential weapon on his person. In that event, the searching officer may initially do no more than is reasonably necessary to confirm or dispel his suspicion that the object is indeed a weapon. 3 W. LaFave, Search and Seizure (2d Ed. 1987), s. 9.4(d), p. 52. To that end, he may remove the object from the suspect's clothing and examine it only so long as is necessary to determine if it can actually be used as a weapon. If it cannot be so used, and is not contraband, it must be returned to the suspect as soon as it is practical to do so. If, however, the object is found to be an actual or potential weapon, the officer may keep it throughout his encounter with the suspect, but must return it promptly thereafter unless the object is contraband or the suspect is arrested and taken into custody. In sum, the officer's conduct of a warrantless frisk must be narrowly tailored, from start to finish, to the accomplishment of its CT Page 7420 only legitimate purpose — the prevention of harm to the officer himself and the public from the suspect's potential access to and use of concealed weapons. Id.
Against this background, Detective Carrello's search of the defendant's jacket and its contents cannot be upheld as a protective search for weapons under Terry v. Ohio. To begin with, it is apparent from Detective Carrello's own testimony that his purpose in searching the jacket was not to find and protect himself and others from the defendant's potential use of dangerous weapons concealed upon his person, but to locate evidence of the unarmed crime of possession of narcotics with intent to sell. Though the subjective purpose of an investigating officer is not necessarily dispositive of the lawfulness of his investigative actions, it is a powerful indicator as to the true state of his knowledge and belief at the time of those actions.
Here, the evidence clearly shows that Detective Carrello searched the defendant's jacket pockets expecting to find a Newport cigarette pack containing cocaine and heroin. That is what the informant had told him he would find there, and that is what he came to believe he would find there based on his observations of the defendant from outside the bar.
The informant, of course, had never suggested that David Gauthier was or might be armed. Detective Carrello, moreover, did not claim to be aware of any other facts or circumstances, upon which a reasonably prudent person in his position might have so suspected. The crime under investigation was neither a crime of violence nor a crime inherently involving the use of arms. The defendant was not seen, nor even rumored to possess, any object which he might have used as a weapon. He had no suspicious bulges in his jacket or beneath his clothing. And he made no furtive gestures indicative of an intent to evade the officers or to resist their efforts to stop him once they entered the bar to search and arrest him. In short, there was no basis whatsoever upon which Detective Carrello could have claimed — and to his credit he did not — that his search of the defendant's jacket was prompted by any reasonable suspicion that the defendant was armed and dangerous.
Consistent with his purpose and beliefs, Detective Carrello concededly made no effort to limit his search of the defendant's jacket and its contents to those minimally intrusive measures CT Page 7421 which the Terry Court authorized because they were "necessary for the discovery of weapons which might [have] be[en] used to harm [him] or others nearby." Id. at 26. Instead of initiating his search by patting down the outer surfaces of the jacket to detect the presence of potential weapons, he simply thrust his hand inside each jacket pocket to retrieve whatever he might find there. And upon seizing the Newport cigarette pack from the upper left jacket pocket, he opened it directly without first probing or manipulating its exterior to determine if it might contain a weapon. Because such measures went beyond what was necessary to determine if the defendant was armed, they cannot be upheld under Terry. Their fruits must therefore be suppressed unless they can be justified under some other recognized exception to the warrant requirements of the United States and Connecticut Constitutions.
 III.
The State has advanced two additional grounds upon which Detective Carrello's full warrantless search of the defendant's jacket and its contents might be upheld under recognized exceptions to the warrant requirements of the United States and Connecticut Constitutions: first, that the search was made incident to the defendant's lawful arrest on the charge of possession of narcotics; and second, that the search was justified by exigent circumstances, to wit: the imminent destruction or disposal of incriminating evidence which Detective Carrello had probable cause to believe he would find on or about the defendant's person. Because these claims involve closely related issues of law and fact, they will be analyzed together.
 A.
It is well settled that a police officer who makes a lawful custodial arrest of a criminal suspect may constitutionally conduct an immediate warrantless search both of the suspect himself and of any place or thing from which he may retrieve either a weapon or incriminating evidence. Chimel v. California, 395 U.S. 752 (1969); State v. Badgett, 200 Conn. 412
(1986). Police officers are permitted to make such full warrantless searches of persons whom they lawfully take into custody to prevent them both from securing any weapons with which they may attempt to resist arrest or escape from custody and from concealing or destroying incriminating evidence. CT Page 7422 Because any arrestee, startled by the realization that he may be about to lose his liberty for a lengthy period of time, may have a strong incentive to secure and make hostile use of dangerous weapons and to destroy or conceal all available evidence against him, the officer's authority to make a full search incident to arrest is not conditioned upon his awareness of specific facts and circumstances particularly suggesting that the arrestee is either armed or in possession of incriminating evidence. Indeed, since the fact of arrest alone is the presumptive source of the arrestee's motivation to make hostile use of available weapons and to dispose of incriminating evidence, the initial justification for making such a search is the officer's awareness of sufficient facts to support the defendant's arrest under controlling legal standards. When the arrest itself is lawful, the ensuing search is also lawful as long as it is limited in scope to those places and things in the immediate vicinity of the arrestee from which it is reasonably feared that he may attempt to retrieve weapons or evidence. When, however, the arrest is unlawful, any search conducted incident thereto is also unlawful because the State has no right to "respond" to any exigency which the actions of its own officers have unlawfully created.
In this case it is clear that the search of the defendant's jacket was well within the scope of a proper search incident to arrest, for the jacket was within three feet of the defendant at the time it was seized and searched by Detective Carrello. The issue here presented is thus whether or not at the time of that search and seizure the searching officers were aware of sufficient trustworthy information to justify the defendant's arrest under controlling legal principles.
The State here contends that by the time of the search of the jacket, Detective Carrello and his fellow detectives had sufficient information to arrest the defendant on the charge of possession of narcotics.[4] In Connecticut, a police officer may reasonably arrest without a warrant any person whom he has reasonable grounds to believe has committed or is committing a felony. Conn. Gen. Stat. 54-1f. Under our law, reasonable grounds to arrest exist whenever the officer has probable cause to believe that the suspect has committed each essential element of a felony offense. State v. Wilson, 153 Conn. 39, 41 (1965). Possession of narcotics is a felony. Conn. Gen. Stat. 21a-279(a). If, then, by the time of his seizure and search of the defendant's jacket and its contents, Detective Carrello had CT Page 7423 probable cause to believe that the defendant was knowingly in possession of narcotics, he could lawfully search the jacket as an incident to the defendant's lawful custodial arrest on that charge.[5]
 B.
The State's second alternative justification for the search of the jacket and its contents is, to reiterate, that the search was justified by exigent circumstances, to wit: the defendant's imminent sale and resulting disposal of incriminating evidence which the searching officers had probable cause to believe was on or about his person. It is equally well settled that a police officer may constitutionally make a full warrantless search of a place or a thing if he has probable cause to believe that it contains seizable contraband or other evidence of crime which will probably disappear or be disposed of if he delays his search to obtain a search warrant. See, e.g., United States v. Johnson, 862 F.2d 1135 (5th Cir. 1988); State v. Enright,17 Conn. App. 142, 148-49 (1988); State v. Scott, 27 Conn. App. 403,407-11 (1992).
Here the State contends that the defendant was actively engaged in the process of selling off his stash of cocaine and heroin when its officers found him at Edgie's Cafe when following up on the anonymous informant's tip. Setting aside, for the moment, any inquiry whether this alleged course of conduct promised so imminent a disposal of the defendant's alleged narcotics as to permit an immediate warrantless search of his jacket to secure the remainder, it must first be shown that the tip and ensuing surveillance established probable cause to believe that the defendant then possessed any narcotics. Without probable cause to so believe, no search for incriminating evidence can be upheld under the exigent circumstances doctrine.
 C.
Against this background, it is apparent that for Detective Carrello's full warrantless search of the defendant's jacket and its contents to be upheld, he must first be shown to have had probable cause to believe that the defendant was then and there in possession of narcotics. Such proof is essential to establish both the lawfulness of the defendant's warrantless arrest on the charge of possession of narcotics and the CT Page 7424 predicate for an exigent circumstances search of his jacket for about-to-be-sold narcotics.
An officer has probable cause to conduct a particular search or seizure when he is aware of sufficient trustworthy information "to warrant a man of reasonable caution in the belief," not the mere suspicion or conjecture, that the facts necessary to justify that intrusion exist. State v. Badgett,200 Conn. 412, 430 (1986) (quoting from Carroll v. United States, 267 U.S. 132, 162 (1925)). To justify a search, the facts and circumstances known to the officer must establish a fair probability that particular items lawfully subject to seizure are presently located in the particular place to be searched. State v. Barton, 219 Conn. 529, 548 (1991). To justify an arrest, the known facts and circumstances must establish a fair probability that a particular criminal offense has been committed and that the person to be arrested has committed it. State v. Williams, 205 Conn. 456, 474 (1987); State v. Asherman, 193 Conn. 695, 705 (1984). The same standards which govern warranted searches and seizures also govern warrantless searches and seizures. Consistent, however, with the strong constitutional preference for warrants, warrantless intrusions may at times be ruled illegal in "doubtful or marginal cases" where warranted intrusions based on identical facts but approved in advance by neutral and detached magistrates will be upheld. U.S. v. Ventresca, 380 U.S. 102,109 (1965); State v. Barton, supra at 552.
It is well settled that both warranted and warrantless searches and arrests may properly be based, in whole or in part, on hearsay information; there must always, however, be a "substantial basis for crediting the hearsay." U.S. v. Ventresca, supra; Gauthier v. United States, 362 U.S. 269, 271
(1960).
Whether or not there is a substantial basis for crediting hearsay upon which a search or seizure is sought to be justified is a frequently litigated issue. Because most crimes are not committed in the presence of the police, officers must typically build their cases and base their investigative efforts on hearsay information from other people.
Logically, for a judge to decide whether or not there is a substantial basis for crediting hearsay information upon which an officer seeks to base a search or an arrest, the judge should CT Page 7425 be
 informed of some of the predicate facts that indicate how the informant gained his information and why the police officer believes that the information is reliable[.]
State v. Barton, supra at 542-43 (Emphasis in original). Presented with this information, the judge can independently determine whether or not the officer has a substantial basis for acting as he proposes to act.
When a person who informs the police of criminal activity is known to the police, the officer seeking to rely on his information can easily determine his reliability. First, of course, he can interview the informant to learn the stated basis for his claims and allegations. He can thereby determine if the informant's observations were first- or second-hand, whether the informant had an adequate opportunity to observe what he claims to have observed, and whether he has sufficient expertise and experience to understand and reliably describe what he saw. Second, he can assess the informant's personal credibility, pressing him to explain any inconsistencies in his story and learning his motive, if any, to falsify information. Thirdly, he can invite the informant to formalize his observations in the form of a sworn statement that can later be used to prosecute him if his tip proves to be false. Generally speaking, an officer can fairly rely on the tip of a known informant who, with no obvious motive to falsify, offers a reasonably detailed account of facts or events he claims to have witnessed first hand. State v. Duntz, 223 Conn. 207 (1992).
Even, however, when the informant is a known criminal, an officer who wishes to rely on his hearsay information can easily determine if there is a substantial basis for crediting his tip. Like any other known informant, a known criminal can be interviewed as often as necessary to determine the true basis for his claims and his possible motives for falsifying them. Because his identity is known, moreover, he too can be prosecuted for giving false information if the facts or circumstances he relates prove to be baseless.
Additional indicators of a criminal informant's reliability may actually be found in his criminal background itself, for as one who is at home in the criminal milieu, he can logically be CT Page 7426 believed to have more direct access to criminals and their activities than other citizens, and to have a more nuanced, experience-based understanding of what he hears or sees in their company than might an ordinary citizen. State v. Santiago,27 Conn. App. 741, 750 (1992). The criminal, moreover, may admit that the reason he knows about the criminal activities in question is that he too participated in them. By so doing he verifies his tip by offering it as a declaration against penal interest. State v. Daley, 189 Conn. 717, 722-23 (1983). In sum, when the informant is a known individual, criminal or otherwise, the police are ordinarily capable both of determining the factual basis for the tip and of ascertaining whether or not the informant is a credible person and/or the information in his tip is reliable.
It is not uncommon, however, for persons reporting criminal activity to offer their tips anonymously. Anonymous tips, by design, are typically so presented as to give the police no idea who transmitted them. Usually, then, they fail to give any explicit information about the informant himself or to so describe any relevant facts or events as to show how the informant acquired his information. Unlike known informants, anonymous tipsters cannot be interviewed for further information, or investigated to determine their backgrounds or prosecuted if they are later found to have lied.
The question thus arises whether an anonymous tip can ever serve as more than the starting point for a criminal investigation. More specifically, if the criminal allegations set forth in an anonymous tip cannot be independently confirmed, can there ever be so substantial a basis for crediting the tip as to justify the making of a search or seizure based upon it? These questions were comprehensively discussed and answered in the affirmative in Illinois v. Gates, 462 U.S. 213 (1984).
In Gates, the United States Supreme Court adopted a "totality of the circumstances" test for reviewing probable cause determinations based on hearsay information from confidential informants. Under that test, which the Connecticut Supreme Court has since adopted for deciding similar issues in cases arising under Article I, Section 7 of the Connecticut Constitution, see State v. Barton, 219 Conn. 529 (1991), a magistrate deciding whether or not to sign a search warrant based on hearsay received from a confidential informant must first: CT Page 7427
 examine the affidavit to determine whether it adequately describes both the factual basis of the informant's knowledge and the basis on which the police have determined that the information is reliable. If the warrant affidavit fails to state in specific terms how the informant gained his knowledge or why the police believe the information to be trustworthy, however, the magistrate can also consider all the circumstances set forth in the affidavit to determine whether despite those deficiencies, other objective indicia of reliability reasonably establish that probable cause exists. In making this determination the magistrate is entitled to draw reasonable inferences from the facts presented. . . .
Id. at 544-45.
So articulated, the Gates-Barton "totality of the circumstances" test replaced the two-prong Aguilar[6]-Spinelli[7]
test that had previously been used to make probable cause determinations in cases involving tips from confidential informants.[8] Under the new test, the essential elements of the old test — the informant's "basis of knowledge" and "veracity" and the "reliability" of his information — are no longer separate and independent requirements, but are "intertwined issues that may usefully illuminate that common sense, practical question whether there is probable cause. . . ." Illinois v. Gates, supra at 230. Accord, State v. Barton, supra at 537. A deficiency on one such issue may therefore be compensated for by a strong showing as to another, or by some other indicia of reliability. Illinois v. Gates, supra at 233; State v. Barton, supra at 544.
Applying its new, more flexible test to the facts of the case before it, the Gates Court held that it was indeed possible to base a finding of probable cause on the tip of an anonymous informant. In Gates, the Bloomingdale (Illinois) Police Department received by mail, on May 3, 1978, an anonymous letter informing them that a Bloomingdale couple, Lance and Sue Gates, were drug dealers who presently stored over $100,000 worth of drugs in their home. Id. at 225. The letter described the CT Page 7428 couple's modus operandi as follows: "Sue . . . drives their car to Florida where she leaves it to be loaded with drugs, then Lance flies down and drives it back." Id. The letter went on to predict that on May 3, Sue Gates would drive down to Florida; that a few days later Lance Gates would fly down to Florida and drive back to Bloomingdale with a car loaded with $100,000 in drugs. Id. The Bloomingdale Police Department, in its ensuing investigation, confirmed the following: that Lance Gates made a reservation on a May 5 flight to Florida; that Lance Gates flew to Florida on May 5; that Lance Gates stayed overnight in a motel room registered in Sue Gates' name; that Lance Gates left the following morning with a woman in a car bearing an Illinois license plate issued to Lance Gates; and that he began driving the car north on an interstate highway used by travelers to the Bloomingdale area. The Bloomingdale Police Department then submitted an affidavit outlining this investigation, together with the anonymous letter, to a judge who issued a search warrant for the Gates' home and car. Id. at 225-26.
The question in Gates was whether the anonymous letter plus the police investigation were sufficient to support the judge's finding of probable cause to search the Gates' home and car. Id. at 225. The U.S. Supreme Court first observed that the anonymous letter alone
 would not provide the basis for a magistrate's determination that there was probable cause to believe contraband would be found in the Gates' car and home. The letter provides virtually nothing from which one might conclude that the author is either honest or his information is reliable; likewise, the letter gives absolutely no indication of the basis for the writer's predictions regarding the Gates' criminal activities.
Id. at 227. The Court went on to hold, however, that since "major portions of the tip's detailed predictions" had been corroborated by the police, the magistrate could fairly conclude that the letter writer had personal knowledge of intimate aspects of the Gates' activities, and therefore that the tip's uncorroborated information concerning the Gates' alleged criminal activities was also sufficiently reliable to support his finding of probable cause: CT Page 7429
 The anonymous letter contained a range of details relating not just to easily obtainable facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted. The letter writer's accurate information as to travel plans of each of the Gates' was of a character likely obtained only from the Gates' themselves, or from someone familiar with their not entirely ordinary plans. If the informant had access to accurate information of this type a magistrate could properly conclude that it was not unlikely that he also had access to reliable information of the Gates' illegal activities. . . . It is enough that there was a fair probability that the writer of the anonymous letter had obtained his entire story either from the Gates' or someone they trusted. And corroboration of major portions of the letter's predictions provides just that probability.
Id. at 245-46 (Emphasis added).
The logic of Gates is compelling. Since most criminals carefully shield their criminal plans and preparations from all but their closest friends and associates, the only persons who are likely to have reliable information about those matters are persons with proven access to the suspect's inner circle. Establishing such access in the case of an anonymous informant is rarely easy, for as previously noted, the informant typically phrases his tip in general descriptive terms so as not to reveal his own identity. Even so, where a tip provably contains accurate information about intimate, hard-to-know aspects of a suspect's private life and affairs — matters which the suspect is as unlikely to reveal to strangers or casual acquaintances as his criminal activities — it is fair to infer that the tipster has, as he claims, comparably reliable information about those criminal activities as well. What matters, of course, is not the amount of accurate detail in the tip but the nature of the details actually corroborated. A casual observer or a mere rumormonger may be able to provide a wide "range of details relating . . . to easily obtainable facts and conditions existing CT Page 7430 at the time of the tip" without knowing anything of substance about a suspect's criminal activities. Gates, supra at 245-46. By contrast, the provider of accurate information about hard-to-know aspects of the suspect's private life demonstrably has close enough ties to the suspect to confirm his probable access to reliable information about the suspect's life of crime.
Since Gates was decided, state and federal courts have frequently had occasion to rule on the constitutionality of searches and seizures based on partially corroborated tips from anonymous informants. As the following discussion illustrates, they have consistently ruled that such tips cannot become the basis for intrusions requiring probable cause unless they contain detailed information about hard-to-know aspects of the suspect's private life and affairs, major portions of which have been corroborated by the police.
In State v. Martin, 2 Conn. App. 605, 613 (1984), for example, the Connecticut Appellate Court applied the principles of Gates to invalidate a warrantless search which was made by police after they had investigated and partially corroborated an anonymous tip. In Martin, an anonymous caller told police that a large "coke" deal, involving a blue Corvette with out-of-state license plates, would take place at a particular bar in twenty minutes. The police drove to the bar very shortly after receiving the call and performed a surveillance for twenty minutes. They then observed a blue Corvette with out-of-state plates and tinted windows enter the parking lot and park in a well-lighted area. The defendant, who had been driving, and a female companion then got out of the Corvette and entered the bar. Fifteen minutes later, the police observed the defendant exit the bar with another man they knew to have been convicted on a narcotics charge eight years earlier. The two men went directly to the Corvette, entered it, and moved it from the lighted area of the parking lot to an unlighted area. Based on these observations, the police, believing they had probable cause to search the car, boxed in the Corvette with police cars, approached the car, and asked the driver for his license and registration. Unable to see inside the car due to its tinted windows, the investigating officer opened the car door for his own protection. Upon doing that, he saw the defendant with a small amber bottle and a small spoon, commonly used for carrying and snorting drugs, on the floor between his legs. The officer then placed the defendant under arrest and performed a search of the car which resulted in the discovery of a package of CT Page 7431 cocaine.[9] The defendant moved to suppress the evidence, claiming that there was no probable cause to search.
The Martin Court first noted that the amount of corroboration needed to corroborate an informant's tip depends on which type of informer has provided the tip.
 [T]hose from a particular informant known for the reliability of his predictions of certain types of criminality in a certain area; those from an unquestionably honest citizen who comes forward with a report of criminal activity, which, if fabricated, would subject him to criminal liability; those from an informant who, although his motives may be open to question, supplies an explicit and detailed description of alleged wrongdoing, along with an indication that the event was observed first-hand, thus entitling the tip to greater weight than might otherwise be the case.
Id. at 614-15. The Martin Court found that the tip relied on by police in that case involved the third type of informer, whose tip:
 [c]an be a permissible starting point where the informant predicts ongoing or future criminal activity as long as the tip provides "an explicit and detailed description of the alleged wrongdoing" so as to indicate "a `fair probability' that the information came from the target of the tip or from someone whom the target trusted, and as long as the probability was provided by corroboration of the `major portions' of the tipster's predictions."
Id. at 615 (Emphasis supplied).
The Martin Court held as follows that while the nature of the tip and its corroboration may have given the police a reasonable and articulable suspicion that the predicted drug sale was taking place, it was insufficient to afford a substantial basis for crediting the tip: CT Page 7432
 Here, the amount of the detail in the tip, which [the officer's] investigation corroborated, was moderate, to say the most. It amounted to the color and make of an automobile with out-of-state plates, and the estimated time and place of its arrival. Compare, e.g., the amount of detail supplied by the anonymous letter-writer in Illinois v. Gates, supra; and the amount of detail supplied by the known informant in Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), described by the court in Gates as "the classic case on the value of corroborative efforts of police officials." Id., 242. What followed the defendant's arrival at the cafe at the generally predicted time and in a vehicle which fit the general description given in the tip was that the defendant left the vehicle with one person, returned with another who had an eight year old drug conviction, and moved the vehicle from an illuminated area to an unilluminated area. While this activity may well have given [the officer] reasonable and articulable suspicion that the predicted drug sale was taking place, and while this is a close case, we cannot say that the amount of the detail originally supplied was enough, and that it was sufficiently corroborated by further detail, so as to establish a fair probability that the anonymous tipster here had obtained his information either from the defendant or from someone whom the defendant trusted. Cf. Illinois v. Gates, supra; Massachusetts v. Upton, supra. We are mindful that "[b]ecause an informant is right about some things, he is more probably right about other facts. . . ." Illinois v. Gates, supra, 244, quoting United States v. Spinelli, supra, 427. Unlike Gates, however, in which the anonymous letter "contained a range of details relating not just to easily obtained facts and conditions CT Page 7433 existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted"; Illinois v. Gates, supra, 245; the nature of the tip and its corroboration here were insufficient to afford "`a substantial basis for crediting the'" tip. Id. Thus, we conclude that the search was based on less than probable cause.
Id. at 616 (citing Gates at 245).
The Martin Court's decision was entirely logical and fully consistent with Gates. First, the tip in Martin was not nearly so detailed as the tip in Gates. It did not describe the car except as to make and color. It did not name the state from which the out-of-state license plate came. And, most importantly, it did not name or describe in any manner any person who would be riding in the Corvette or any person with whom they were to consummate the "coke deal" at the bar. Apart from the drug sale itself, the details provided related only to mundane matters which, though involving the future actions of third parties, could as easily have been known by casual acquaintances or observers of the suspect as by persons with inside knowledge or his criminal activities.[10]
Second, since the tip did not contain "detailed predictions" concerning "future actions of third parties not easily predicted," no such details were ever corroborated. What was corroborated — the arrival of a particular type of car bearing out-of-state plates some twenty minutes after the tip was received — was simply insufficient to meet the high standard set in Gates. Finally, though Martin did meet a known criminal with a drug conviction under circumstances suggesting a desire to conduct private business out of sight, that did not give the surveilling officers a substantial basis for crediting his tip.
The Martin Court's analysis was confirmed several years later when the U.S. Supreme Court decided Alabama v. White,496 U.S. 325 (1990). In White, the police stopped a car driven by the defendant after partially corroborating an anonymous tip that she was about to leave a particular apartment in a particular vehicle to drive to a particular motel with drugs in her possession. There, the police immediately established a CT Page 7434 surveillance outside the apartment, then saw the defendant leave, as predicted, walk to the car indicated by the informant, then drive away along the shortest and most direct route toward the motel. Before she reached the motel, the pursuing officers stopped her car, obtained her consent to search it, and found a quantity of drugs in her possession.
The issue presented in White was whether the pursuing officers had a reasonable suspicion that White was committing a crime when they pulled over her car near the motel. Under the circumstances there in question, probable cause was not needed to justify the officer's actions. Still, the case is very instructive on the nature and degree of corroboration needed to justify a finding of probable cause based on an anonymous tip, for the White Court explicitly observed that although every detail of the tip except the defendant's possession of drugs had been corroborated, the case was at best a "close case" under the lower, reasonable-suspicion standard for investigative stops. Although the anonymous tipster clearly had some proven basis for his prediction, the amount and kind of detail he provided was simply not of a sort that could only have been learned from the suspect himself or from someone so intimately familiar with her private life and affairs as probably to know of her criminal activities. Unlike the Gates informant, who accurately predicted detailed movements through many states over a period of several days, with complex transportation arrangements quite consistent with drug trafficking, the White informant, like the Martin informant, only gave simple, time-limited predictions of ordinary movements rather easily predicted by anyone at all familiar with the suspect. Since there is nothing particularly unusual, and certainly nothing suspicious, about leaving one identified location and going to another by a common means of transportation, it is easy to understand why the White Court observed that even with full corroboration of those predictions, this was a "close case" under the reasonable-suspicion standard.
In sum, for an anonymous tip to become the basis for a finding of probable cause, it must be so unusually accurate in its descriptions or predictions of hard-to-know facts and events as to confirm that the informant probably has reliable information about the suspect's criminal activities. Anything less, though perhaps enough to justify an investigative stop, under Terry v. Ohio, simply cannot pass muster under the more stringent test of Gates and Barton. CT Page 7435
 D.
In this case, Detective Carrello's search of the defendant's jacket and its contents was not supported by probable cause because there was not a sufficient basis for crediting the anonymous tip and relying on its conclusion that David Gauthier was in possession of narcotics. The information gained from the tip and police corroboration thereof failed to "raise the totality of the circumstances from the level of suspicion to the level of probable cause." Martin at 613.
The tip in this case came from an unknown person who neither told the officer how he had obtained his information nor gave him any particular basis upon which to infer that he was credible or that his information was reliable. He did not claim to have seen the defendant possess any narcotics, much less sell them to any other person. He did not claim any ability to recognize either narcotics or the telltale signs of drug trafficking. He did not claim to have seen the Newport cigarette pack in which he said that the defendant was carrying his drugs. Indeed, he never even claimed to have been present at Edgie's on the evening of December 19, 1991, much less to have seen the defendant there, in the barroom, in the men's room, or elsewhere. For these reasons, the informant's tip gives this Court no basis upon which to find that the informant obtained his information by reliable means.[11]
The informant, moreover, was completely unknown to the officers except for his sex, his state of mind, and his desire to remain anonymous. A nervous-sounding male of unknown background, experience and description, he could have been a common citizen or a common criminal, a man with great experience in the underworld or none at all, a person of impeccable integrity or a vengeful liar. This Court, therefore, has no basis upon which to assess either the credibility of the informant or the reliability of his information. Standing alone, the tip plainly did not establish probable cause.
The question thus becomes whether Detective Carrello's careful effort to corroborate the tip afforded him and his fellow officers so substantial a basis for crediting it as to support a finding of probable cause that the defendant possessed narcotics at the time of the search. For the following reasons, it did not. CT Page 7436
In Gates, the anonymous tip provided a detailed prediction of the Gates' travel itinerary which the tipster could only have learned about from the Gates themselves or from someone trusted by them. Here, however, Detective Carrello's investigation did not corroborate any difficult-to-predict future actions of the defendant necessary to credit the tip, but only innocuous details which were insufficient to give substantial credit to an anonymous tip.
Carrello thus confirmed that the defendant was present at Edgie's, moving around and talking with people in the bar, and initially, at least, wearing a green camouflage jacket. Such details, however, obviously related "just to easily obtainable facts and conditions existing at the time of the tip, [not] to future actions of third parties ordinarily not easily predicted." See, Gates, 245-46. They were clearly not "of a character likely obtained only from the defendant himself, or from someone familiar with his not entirely ordinary plans." Id. Corroboration of such innocent, ongoing activity in a public place — activity which could easily have been seen by any person in the bar and could readily have been predicted by any person who knew that the defendant might be there — did not demonstrate that the tipster had reliable information about the defendant's criminal activities.
In this case, the only parts of the informant's tip which, if corroborated, could have suggested that the informant had inside knowledge of the defendant's criminal activities were that he possessed a quantity of cocaine and heroin inside a Newport cigarette pack, that he kept the pack and its narcotic contents inside the pocket of his green camouflage jacket, and that he was selling his narcotics inside the men's room at Edgie's Cafe. Because Detective Carrello was unable to corroborate any of these hard-to-know details, much less a major portion of them, he lacked a substantial basis for relying on the tip as the basis for the search seizures here challenged.
First, Detective Carrello saw no narcotics or drug paraphernalia of any kind, either on or near the defendant or on any of the persons with whom he spoke inside the bar. An experienced observer of the drug scene, Carrello would surely have taken note of such items had they come to his attention.
Second, the detective never saw the defendant hold, possess or have access to a cigarette pack or small container of any CT Page 7437 kind, much less the Newport pack which the informant had mentioned. Not only was such an object never in sight, but the defendant was never seen to have a bump or a bulge in his clothing where the object might have been concealed.
The detective did, of course, see the defendant converse on separate occasions with three different men, then walk briefly with each man to a place in the bar where Detective Carrello could no longer see them. But in view of the layout of the barroom and the location of the detective's surveillance posts, the most these observations suggested was that the men might have gone to the men's room. None of the defendant's companions in the bar was a known or suspected drug abuser. None flashed money or looked furtively about him before going with the defendant to the back of the bar. And none was later seen engaging in conduct suggestive of recent drug use.
The defendant, more importantly, was never seen to do more than converse with each man — a commonplace event in a neighborhood bar — before walking away with him to another part of the bar. Significantly, neither the defendant nor any of his companions was ever seen to enter the hallway to the rest rooms, much less to enter the men's room itself.
Gauthier, moreover, was not seen wearing his jacket on any of the three occasions he was alleged to have moved toward the back of the barroom with any of his three companions. Carrello never saw him go to, remove things from or place things inside his jacket. Indeed, after Carrello first saw Gauthier wearing the jacket, he did not see it again until he entered the bar, found it draped over a chair, and searched it.
At most, Detective Carrello's limited corroboration of certain public and innocuous details contained in the informant's tip showed that the informant had some superficial knowledge of the suspect's ongoing activities. Corroboration of such "easily obtainable facts and conditions existing at the time of the tip" does not provide so substantial a basis for determining that criminal activity is occurring as to justify a search or arrest requiring probable cause.[12]
Here, in fact, the amount of police corroboration was actually less than that which was deemed insufficient in State v. Martin. There, in addition to corroborating the defendant's arrival at the cafe at the generally predicted time and in a CT Page 7438 vehicle which fit the general description given in the tip, the police observed the defendant return to his car with another man who had a criminal record for drug charges, then go with the man in his car to an unlighted portion of the parking lot. Still, the Martin Court characterized this amount of corroboration as merely "moderate" and insufficient to support a finding of probable cause. Martin, supra at 615. In this case, by contrast, the information provided was merely descriptive of ongoing behavior, not predictive of future conduct, and the men with whom Gauthier spoke were unknown. Like Alabama v. White, this was at most a case in which there was corroboration of easily predicted facts and conditions existing at the time of the tip. Corroboration of such insignificant details hardly established that this anonymous tipster had reliable access to accurate inside information about the suspect's criminal activities. Cf. State v. Santiago, supra.[13]
A final reason why this case falls short of the standard set in Gates is that here, unlike there, the challenged search and seizures were conducted without a warrant. Because warrantless searches and arrests are per se unreasonable, no deference is to be accorded police decision-making in close cases where a magistrate's probable cause determination might be upheld on similar facts. State v. Barton, supra at 552 (citing U.S. v. Ventresca, 380 U.S. 102, 109 (1965)).
CONCLUSION
Detective Carrello's observations of the defendant walking toward the back of the bar with three different unidentified males at most created a reasonable suspicion that David Gauthier possessed or was selling narcotics. Therefore, because no warrant was obtained, this Court finds that the State has not met its burden of justifying the warrantless arrest or search of the defendant. Neither the anonymous informant's tip nor the detective's independent investigation was sufficient to establish probable cause to believe that David Gauthier was selling narcotics which he possessed in a Newport cigarette pack which he kept inside his jacket. As a result, any arrest of David Gauthier or search of his person or belongings was illegal. All of the items seized from the defendant on December 19, 1991 — the pack of Newport cigarettes, the cocaine, the heroin, the i.d. card for David Gauthier, the syringe, and $553 in cash — are therefore ordered suppressed. CT Page 7439
Michael R. Sheldon, J.